427 So.2d 1285 (1983)
David Fred MARLATT, Plaintiff-Appellee,
v.
Teresa Ann Anderson MARLATT, Defendant-Appellant.
No. 15184-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1983.
*1286 Joe D. Guerriero, Monroe, for plaintiffappellee.
McLeod, Verlander & Dollar by Robert P. McLeod, Monroe, for defendant-appellant.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
NORRIS, Judge.
Teresa Ann Anderson Marlatt appeals that portion of a divorce judgment awarding custody of her four year old son to his father, David Fred Marlatt.
On November 23, 1981, Mr. Marlatt filed a petition for divorce and custody of the minor child born of the marriage against Mrs. Marlatt alleging acts of adultery. Mrs. Marlatt did not contest the divorce but did vigorously contest the custody issue. This matter was tried over a two day period, the trial court took the matter under advisement, and in well reasoned and explicit reasons for judgment the trial court awarded the permanent care, custody, and control of the minor child to his father.
Mr. and Mrs. Marlatt began dating in 1976, when Mrs. Marlatt was 16 and Mr. Marlatt was 22. She became pregnant once prior to their marriage and had an abortion with the consent and assistance of her mother. Despite her parents' protestations, she continued to date Mr. Marlatt and became pregnant again with the minor child made the subject of this custody dispute. The parties were married on April 7, 1978 in Marshall, Texas, and this child was born on November 10, 1978. Shortly after the marriage, Mr. Marlatt dropped out of Louisiana Tech and took a job with Reliable Finance as Assistant Manager. In 1979, Mr. Marlatt terminated his employment with Reliable and the Marlatts moved to West Monroe where Mr. Marlatt accepted employment with Aetna Finance Company. In July, 1980, Mrs. Marlatt became pregnant again. Soon thereafter, Mr. Marlatt resigned from his job with Aetna and began working at Bastrop Furniture Company. In December, 1980, Mrs. Marlatt gave birth to a second son two months prematurely. This child lived for approximately 21 days.
After the death of this child, Mrs. Marlatt enrolled at Northeast Louisiana University with the intention of earning an associate degree in nursing. She continued her education at Northeast until June or July, 1981.
During this period of time, even prior to the second pregnancy, Mr. and Mrs. Marlatt were experiencing some marital difficulties. The death of their second child affected both of them significantly. In 1981, the Marlatts moved from West Monroe to Bastrop, where Mr. Marlatt was employed and where both of their families resided. Mr. Marlatt terminated his employment with Bastrop Furniture Company and accepted employment with Gulfco Finance Company in Farmerville. Mrs. Marlatt transferred to the Vocational School in Bastrop to continue her training in the field of nursing. The minor child was enrolled in a structured nursery school called the Prep Center in Bastrop while his mother attended school. During this period of time, it was the responsibility of Mr. Marlatt to see that the child was fed, dressed and delivered to the nursery school in the morning, and the parties were sharing in the care of their minor son.
Prior to the move to Bastrop and while the Marlatts were living in West Monroe in February, 1981, Mrs. Marlatt began talking to and consulting with a doctor in Bastrop who is in his late fifties, has grown children, had delivered Mrs. Marlatt and was a close, lifetime family friend of Mr. Anderson, Mrs. Marlatt's father. This contact was initiated by the doctor who frequently called Mrs. Marlatt while she was living in *1287 West Monroe, and as time passed, the relationship became more personal. During the summer of 1981, the contacts between Mrs. Marlatt and the doctor became more frequent and more intense, and at some point in time during the fall of 1981, Mr. Marlatt became increasingly suspicious about his wife's numerous phone conversations and her mysterious absences from home at varied hours of the day and night.
At the suggestion of an attorney not involved in this suit, Mr. Marlatt placed a "tap" on his telephone and recorded conversations between Mrs. Marlatt and the doctor and members of her family. On November 10, 1981, Mr. Marlatt found his wife and the doctor, along with the child, at an "apartment" located over Mr. Anderson's place of business. Mr. Marlatt contacted Mr. Anderson who returned to the scene with him. On this occasion, Mr. Anderson informed Mr. Marlatt that he would handle this situation but seemed to be more upset with Mr. Marlatt than he was with his daughter or his friend who had been given a key by Mr. Anderson. Both Mrs. Marlatt and the doctor denied sexual activities on this occasion.
Thereafter, with the assistance of private investigators, Mrs. Marlatt and the doctor were found at the home of the doctor while his wife was absent where they were observed to have spent the night together on November 21-22, 1981.
On November 23, 1981, Mr. Marlatt filed a petition for divorce alleging acts of adultery, after removing himself and his minor child from the marital domicile and moving in with his parents. Mr. Marlatt has had the continual custody of his child since the date of the separation.
The only instances of sexual intercourse admitted by Mrs. Marlatt and the doctor were on two occasions, the one previously mentioned and on another occasion in October, 1981, again at the home of the doctor while his wife was absent. These are the only two occasions that are affirmatively established by the phone conversations. They denied any other sexual activity and both testified that all of the other clandestine meetings were solely for the purpose of "talking." During the tenure of the relationship, they were talking on the phone several times a day  sometimes as many as ten  and seeing each other at isolated, hidden locations at various hours of the day and night.
At trial, Mrs. Marlatt admitted that what she had done was wrong, expressed her remorse and vowed that such conduct would not be repeated. She further testified that she had quit nursing school the Monday prior to trial to make a permanent home for her child at her parents' residence and that she had terminated her relationship with the doctor. She testified that she rarely went out socially, was attending church regularly, and was having a good relationship with her parents and her younger sister. She further contended that during the marriage, her husband drank daily and excessively, abused her physically, frequently stayed away from home, treated her as a child, and seldom accepted parental responsibility for his son. She also complained of his frequent changes of employment and his inability to furnish full financial support.
On the other hand, Mr. Marlatt contended that his wife often left the child with sitters to pursue personal activities and particularly during the last months of the marriage left several mornings prior to the child's awakening and several nights a week in order to meet her "lover." Her admitted adultery, her whole lengthy relationship with her lover, her erratic and irresponsible behavior and her apparent delay contesting custody[1] and the circumstances in her parents' home are cited as reasons why she is unfit. Finally, Mr. Marlatt contended that the child has been well cared for while in his parents' home, has done well in nursery school, has adjusted well and has considerably improved in physical and emotional health.
*1288 After hearing all of the evidence and considering this issue, the trial court in its reasons noted that the conduct of Mrs. Marlatt and the entire presentation of her case "track very closely the `guidelines' or factors in appellate jurisprudence favorable to the mother in custody disputes," and concluded that superficially she seems to fit the cited jurisprudence "like a glove." However, the trial court concluded that with careful analysis of the evidence her position became more troublesome. The trial court made the following specific findings of fact basic to the issue of the child's welfare and best interest:
1. The only admissions defendant and her lover made were of the bare circumstances in which they had been caught red-handed, having admitted a pre-trial study of the telephone tapes. Otherwise, the Court finds that their representations of a purely platonic, "talking" relationship at dozens of clandestine meetings (sometimes two or three times in one day and night) at secret and constantly changing locations is virtually incredible, especially in view of the words they used and their expressions of all-consuming love repeated so often in their telephone conversations.
2. For a year or more prior to the separation, during its mother's pregnancy and during her venture in schools, the child spent as many daylight hours in a nursery as it did with its mother, if not more. Also, the evidence is clear that the father was not totally disassociated from the functions of child care and did assist the mother. Progressively more frequently after the return to Bastrop in June, 1981, the mother was pre-occupied with her lover and her intentions and desire to separate from her husband; and for the final four or five months until she was trapped, she frequently abandoned or substantially shirked her maternal responsibilities.
3. The efforts of defendant to convince the Court of complete reformation not only of actions but of attitude and adult responsibility have fallen somewhat short and leave the Court with some serious apprehensions. She now blames her husband for luring her into sex and marriage at a tender age and her recent lover for casting a spell over her. If this be true, the Court must be concerned that her fundamental lack of self-discipline and her inclination to dislike and rebel against the routine and restrictions of a structured home life (first at her parents' home only five years ago and then with her marriage home over the past year or so) may and likely will lead her astray again. She is back again, and intends to keep her child with her, in her parents' home where she rebelled previously; and one of the occupants of that home is a younger sister who seems to be pursuing almost exactly the same course of action defendant did at that same age.
4. Defendant's parents, both of whom testified, were partisan and protective witnesses to a substantially greater degree than is to be expected in such cases; and they were both somewhat less than candid in some details. Moreover, it was quite clear that they were less than enthusiastic toward their son-in-law, were privy to the desire and plans for a separation, resisted (or at least failed to assist) plaintiff's efforts to enlist their aid when he began to suspect defendant's conduct and she began to ignore her maternal responsibilities. Even when defendant's father saw his daughter and grandson with her lover at the shop, he was more critical and testy with plaintiff than with his daughter, still blamed plaintiff for the marital problems and still was protective of defendant.
5. The representations that defendant instantly terminated her relationship with her lover, recognizes it to have been "wrong," is sorry for it and has no use for him are inconsistent with some of her telephone conversations with the doctor after they were caught. In addition, she seems as much to have been following the suggestions of a private detective friend and the jurisprudence as her own instincts and purposes. For example, she quit nursing school on Monday before the *1289 trial began on Thursday in order to be available to give full time care to her child if she gets custody.
6. This is not a case in which the father seeks to remove custody from a mother caught in adultery after separation but otherwise properly relating to her child. Rather, at least for the three to five months before separation and for six months since suit was filed, the father has been the primary "nurturing" parent and has had full custody for the latter period. As early as two weeks after the suit was filed, a rule for provisional custody was scheduled, but not heard. After several continuances of that rule, defendant actually stipulated for provisional custody to be in the father.1 Hence, there has been no trickery or delay on the part of plaintiff to enhance his position or deprive defendant of her relationship with the child. Instead, the evidence is uncontradicted that the child is extremely well cared for by the nursery school, its father and its parental grandparents, who provide an unusually suitable physical home and nurturing routine for the nearly four year old. There is credible evidence that both his physical and his emotional health have improved as has his behavior, as contrasted with the turmoil and confusion and secondary status in which he lived for several months prior to the separation. He is visiting every other weekend with his mother and maintaining a relationship with her and her family while living primarily in the most stable circumstances he has known for some time.
7. Finally, defendant argues that to deprive her of custody would "punish" her for past indiscretions of which she has repented and should be forgiven. But the Court finds that this argument completely overlooks the interests of the father, who would thus be "punished" for no indiscretions or for far less "unparental" shortcomings than displayed by defendant. Litigants and sometimes judges seem to forget that when awarding custody to one parent, the law is at the same time depriving the other; and to focus upon the "deprivation" of the mother only would be nothing more or less than re-enactment of the "maternal preference rule." The father's work hours are such that he has ample time to take the child to nursery school and to be with it in the late afternoons and on weekends, and otherwise to be a parent, to almost precisely the same degree as defendant would have afforded before the last minute resignation from school.2 Moreover, financial considerations are favorable to the father, since the mother will not be entitled to alimony, has no job or skill or experience and will be entirely dependent on her parents to supplement whatever maximum child support could be awarded.
In sum, while the Court feels that the evidence briefly summarized here may well be sufficient to support a finding that defendant is "morally unfit" in the jurisprudential sense of that term, it is not necessary so to "brand" her. The evidence clearly demonstrates that for a number of months, at a crucial time in the child's life, she substantially defaulted in her maternal obligations, put her own interests and her adulterous affair above her child's interest, has manifested and continues to manifest immaturity and considerable lack of self-control and self-discipline, as well as a repeated inability to adjust to and cope with unpleasant routines and restricting circumstances (which is the stuff of which many aspects of parenthood is made). More important, for the better part of the past year, the father has been primarily responsible for meeting the child's needs and has done so commendably. The present home and circumstances of the child seem to be as satisfactory and as beneficial to its welfare as could be expected with one parent. For these reasons, it is very much in the child's best interests that his custody remain with plaintiff.[2]
*1290 On appeal, Mrs. Marlatt contends that the trial court erred when it granted custody to Mr. Marlatt because this decision failed to properly protect the best interest and welfare of the minor child and that the best interests of the minor child are best protected by placing him in the custody of his mother.
The crux of the argument of Mrs. Marlatt is that she has been the primary nurturing parent of the minor child, her adultery did not adversely affect her relationship with her son and Mr. Marlatt is a threat to the best interest of the minor child. Mrs. Marlatt emphasizes the recognized fact that in many, if not most cases, it is recognized by Louisiana courts that it is a natural fact that children of tender years do better with the mother where the mother has been the primary nurturing parent and a close bond exists between the mother and the child. Cleeton v. Cleeton, 383 So.2d 1231 (La.1979); Thornton v. Thornton, 377 So.2d 417 (La.App. 2d Cir.1979).
Mrs. Marlatt also emphasizes that because her adulterous relationship with the doctor never adversely affected her relationship with her son that her adultery is no cause for denying her custody. Nale v. Nale, 409 So.2d 1299 (La.App. 2d Cir.1982); Manley v. Manley, 389 So.2d 454 (La.App. 2d Cir.1980). She further submits that the trial court has incorrectly attempted to punish her for her past transgressions by denying her custody citing Nale v. Nale, supra, for the proposition that an act of adultery does not render a person morally unfit when such an act was discreet. Finally, Fulco v. Fulco, 259 La. 1122, 254 So.2d 603 (La.1971) is cited for the proposition that deprivation of custody of a minor child should not be utilized as punishment for a mother who occasionally transgresses the moral code.
Conversely, Mr. Marlatt contends that the determination of the trial judge in child custody matters is entitled to great weight because he is in a better position to evaluate the best interest of the children from his total overview of the conduct and character of the parties and the children and of community standards and that his discretion on the issue will not be disturbed on a view in the absence of a clear showing of abuse. Bagents v. Bagents, 419 So.2d 460 (La.1982).
Mr. Marlatt also contends that courts recognize the stability factor as one factor in determining questions of custody and that it is in the best interest of children to leave them in a stable environment to which they have become accustomed. Coltharp v. Coltharp, 368 So.2d 793 (La.App. 2d Cir.1979). Finally, Mr. Marlatt argues that the issue of "maternal preference" is only one of the many factors to consider in determining the best interest of children and that the consideration given this factor should not be so great as to only be overcome by showing that the mother is unfit or unstable. Hegan v. Hegan, 367 So.2d 147 (La.App. 2d Cir.1979).
Each of these statements asserted by the litigants is a correct reflection of the general principles of law that relate to custody cases. In Tabor v. Tabor, 421 So.2d 1185 (La.App. 2d Cir.1982) we cautioned counsel about the state of the law:
In civil appeals, our review extends to facts and law. LSA Constn. Art. 5, § 10(B). We recognize the difficulty and futility of attempts to reconcile the many reported opinions in child custody disputes. Appellate courts cannot and do not lay down hard and fast rules and guidelines in these cases and counsel should not take a factor or legal principle from one case and assert that factor or legal principle as controlling in another *1291 case because each case deals with a peculiar parental relationship which will exist prospectively, and then only as long as the circumstances in the relationship do not change in the future. The only common features in these cases are the principles that each case must be determined on its own facts, that the trial courts shall make the determination on the best interest of the child, and that, in the absence of a showing of a clear abuse of discretion, the appellate court will uphold the trial court's judgment. [Citations omitted.] * * *
The trial court determined that it was in the best interest of the minor child to award custody to the father. This determination was based on the past actions of the mother, which he interpreted as demonstrating a pattern of disregard of parental responsibility during her affair with the doctor; the fact that the father had shared with the mother the responsibility for caring for the minor child during the marriage; and the fact that the child seemed to be doing well in his present placement. Although Mrs. Marlatt professed that she had rehabilitated herself and reformed, the trial court did not choose to believe her; this conclusion was a credibility decision which is supported by the record.
While the members of this or any court may have reached a different conclusion had they heard this case at trial, we cannot say in this case that the trial court abused its great discretion and erred as a matter of law in awarding custody to Mr. Marlatt. Finding no manifest error in the trial court's decision, we affirm at appellant's cost.
JUDGMENT AFFIRMED.
NOTES
[1] The delay in seeking custody from the original rule was fixed in December, 1981, until the trial in May, 1982, was explained by Mrs. Marlatt's attorney as a decision which was made by him.
[2] The footnotes contained in the trial court's reasons are as follows:

1. The Court does not imply "forfeiture" from the failure to contest custody earlier, and notes counsel's oral argument that this was primarily his decision for both practical and legal reasons.
2. In view of defendant's oft-repeated testimony that she has been interested for some time in a nursing career for both financial and emotional reasons having to do with selfexpression and independence, and considering her history as briefly mentioned herein, the Court must be concerned that neither she nor her family will be able to live with these circumstances indefinitely.