385 S.E.2d 912

**DAVID M.**

v.

**MARGARET M.**

No. 19020.

Supreme Court of Appeals of West Virginia.

Oct. 19, 1989.

58

Patrick E. McFarland, Eugene T. Hague, Jr., Redmond, McFarland & Hague, Parkersburg, for appellant, Margaret M.

Philip E. D'Orazio, Parkersburg, for appellee, David M.

NEELY, Justice:

Margaret M. appeals from a divorce order entered by the Circuit Court of Wood County that awarded David M. custody of their son, Timothy, age six.[1] Mrs. M. contends that the Circuit Court erred in adopting the findings of the family law master which held that although Mrs. M. was the primary caretaker of the child, she was not a fit and suitable person to have permanent care and custody of the child. We agree with Mrs. M. and reverse the trial court's ruling.

The parties were married on 4 August 1979 and lived together in Wood County until 7 September 1988. Mr. M. filed a complaint alleging cruel and inhuman treatment or, in the alternative, adultery and seeking custody of their son, then age five. In her answer, Mrs. M. denied the allegations, filed a counterclaim alleging irreconcilable differences and sought custody of their son. Mr. M., in his reply to the counterclaim, admitted that irreconcilable differences existed between the parties.

The case was referred to a family law master and by agreement of the parties the case was bifurcated with only the divorce and the custody issues to be heard, reserving all other issues for further proceedings. After a hearing on the matter, the family law master found: (1) irreconcilable differences existed between the parties; (2) Mrs. M. was the primary caretaker; (3) Mrs. M. had committed adultery on two occasions over two years; and (4) Mrs. M. was not a fit and suitable person to have custody of the child. The Circuit Court adopted the findings and conclusions of the family law master, granted the parties a divorce, and awarded Mr. M. custody of their child, subject to reasonable visitation rights.

In the present case, although the primary caretaker parent rule as described in *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357 (1981), appears to have been followed, the primary caretaker was denied custody through a broad interpretation of the fitness requirement.[2] We have noted that

---

1. Mr. M. has two other children from a previous marriage, Matthew and Jason, who live with their mother.

2. For other cases in which the lower court erroneously applied a broad interpretation of the fitness requirement *see Isaacs v. Isaacs,* 178 W.Va. 272, 358 S.E.2d 833, 835 (1987) (Custody should not be determined on apparent sexual misconduct.); *M.S.P. v. P.E.P.,* 178 W.Va. 183, 358 S.E.2d 442 (1987) (A lower court should not award joint custody of the children with primary residence with the non-caretaker parent because of the "moral atmosphere" of the home of the caretaker parent.); *Bickler v. Bickler,* 176 W.Va. 407, 344 S.E.2d 630, 632 (1986) ("[A] circuit court may not base a finding of parental unfitness solely on the ground that a parent is guilty of sexual misconduct."); *Stacy v. Stacy,* 175 W.Va. 247, 332 S.E.2d 260 (1985) (Adultery, without a deleterious effect on the children is insufficient evidence of parental unfitness.); *Rowsey v. Rowsey,* 174 W.Va. 692, 329 S.E.2d 57 (1985) (The speculative harm of a mother's

our *very* narrow exception to the primary caretaker rule has of late developed a voracious appetite which, if left unchecked, will allow it to eat the rule. We write today to reaffirm and clarify the benefits of the primary caretaker parent rule to assist the family law masters and the circuit courts in reaching the best interests of the child by applying the primary caretaker parent presumption and its *limited* requirement of fitness. When properly applied, the primary caretaker parent presumption reduces sharp practices in custody negotiation, prevents fathers and mothers from being penalized on account of their gender, and avoids custody battles that are so unwieldy and intrusive that they make the lives of a divorcing couple and their children even more miserable than they otherwise would be.

## I

In the nineteenth century, and in the early part of this century, the law gave fathers custody of their children after divorce, particularly when mothers were held at fault in breaking up the marriage.[3] That rule was a logical extension of the inferior legal status of women, the husband's property right in his family's labor, and the husband's absolute obligation to support his children.[4] Even a hundred years ago, however, this rule made little

sense in light of human emotions and society's expectation that children would be raised by women. Consequently, it was abolished in this century. By 1950, it was almost always the rule that a mother was the preferred custodian of young children if she was a fit parent.[5]

But the behavior that different courts characterized as evidencing "fitness" differed dramatically. In application, the rule of maternal preference allowed judges substantial leeway to take a mother's fault into consideration in the award of custody. It was frequently the case, therefore, that sexual "promiscuity" (a term that tends to mean different things when applied to women than to men, with women getting the short end of the double standard) on the part of the woman would cause a court to declare her "unfit." [6]

Currently, all parental rights in child custody matters are subordinate to the interests of the innocent child. The pole star in child custody cases is the welfare of the child. We have repeatedly acknowledged that the child's welfare is the paramount and controlling factor in all custody matters. *J.B. v. A.B., supra* note 5, 161 W.Va. at 335–36, 242 S.E.2d at 251; *Funkhouser, supra* note 5, 158 W.Va. at 969, 216 S.E.2d at 573; *Boos v. Boos,* 93 W.Va. 727, 117 S.E. 616 (1923); *Dawson v. Dawson,* 57 W.Va. 520, 50 S.E. 613 (1905).

friendship with another woman who was a lesbian does not require a change of custody.); *Mormanis v. Mormanis,* 170 W.Va. 717, 296 S.E.2d 680 (1982) ("[M]arijuana ... smoked in a car in which the [mother] was at one point present [without evidence] that the child was in the car at the time" is insufficient evidence of parental unfitness.).

3. J. Westman, *Child Advocacy* 273 (1979); Derdeyn, "Child Custody Contests in Historical Perspective," 133 *Am.J. Psychiatry* 1369, 1370 (1978). For documentation of the paternal preference and the emergence of the maternal preference in some states during the nineteenth century, see Foster & Freed, "Child Custody," 39 *N.Y.U.L.Rev.* 423, 425 (1964); Schiller, "Child Custody: Evolution of Current Criteria," 26 *De Paul L.Rev.* 241, 242–44 (1977); Comment, 12 *Cum.L.Rev.* 513, 515–17 (1982).

4. Derdeyn, *supra* note 3, at 1370; Schiller, *supra* note 3, at 242; Foster & Freed, *supra* note 3, at 423–25; *Norman v. Norman,* 88 W.Va. 640, 107

S.E. 407 (1921) (modifying the "general rule" that the father is the natural custodian of his minor children).

5. J. Westman, *supra* note 3, at 273; Foster & Freed, *supra* note 3, at 425. Syllabus Point 1, *J.B. v. A.B.,* 161 W.Va. 332, 242 S.E.2d 248 (1978) (" 'With reference to the custody of very young children, the law favors the mother if she is a fit person, other things being equal.' Syl. pt. 1, *Funkhouser v. Funkhouser,* [158] W.Va. [964], 216 S.E.2d 570 (1975)"); Syllabus Point 2, *Settle v. Settle,* 117 W.Va. 476, 185 S.E. 859 (1936); *Beaumont v. Beaumont,* 106 W.Va. 622, 146 S.E. 618 (1929).

6. *Settle, supra* note 5, 117 W.Va. at 476, 185 S.E. at 859 (A mother's primary right to the custody of her children may be lost if her marital conduct has been questioned.). *See Finnegan v. Finnegan,* 134 W.Va. 94, 58 S.E.2d 594 (1950) (Custody of children should be awarded to the innocent spouse.).

In *J.B. v. A.B.*, we examined our custody presumption in favor of mothers in light of our concern for the welfare of the child and found:

> The welfare of the child seems to require that if at all possible we avoid subjecting children to the trauma of being wrenched away from their mothers, upon whom they have naturally both emotional and *physical* dependency.

*Id.* 161 W.Va. at 338–39, 242 S.E.2d at 253 (emphasis in original).

Today, the presumption in favor of mothers is rapidly eroding because the maternal preference presumption discriminates against fathers on the basis of sex. In the 1980 amendment to *W. Va. Code*, 48–2–15, the legislature provided in relevant part:

> ... There shall be no legal presumption that, as between the natural parents, either the father or the mother should be awarded custody of said children but the court shall make an award of custody solely for the best interest of the children based upon the merits of each case.[7]

Although in *Garska, supra*, 167 W.Va. at 70, 278 S.E.2d at 363, we abolished the gender-based presumption, we reaffirmed our holding in *J.B. v. A.B.*, "except that wherever the words 'mother,' 'maternal,' or 'maternal preference' [were] used" some variation of the term "primary caretaker parent" should be substituted.

In jurisdictions that retain some type of maternal preference in awarding custody of very young children, the maternal preference has become largely a tie breaker. The emerging rule is that all custody disputes be decided on their individual merits, with the parent whom the judge considers the most competent receiving custody.[8] At first glance, this emerging rule seems to make sense, since some fathers are excellent parents and some mothers are child abusers.[9] Unfortunately, however, this individualized, sex-neutral approach poses serious problems because the welfare of the child is often lost by the distorted incentives created by the divorce settlement process.

Substantial research has confirmed that young children, as a result of intimate interaction, form a unique bond with their primary caretaker. This unique attachment to a primary caretaker is an essential cornerstone of a child's sense of security and healthy emotional development.[10]

> At the earliest stage, [the attachment to a primary caretaker] is critical to the child's learning to place trust in others and to have confidence in her own capacities. Later, it plays a central role in the child's capacity to establish emotional bonds with other persons. The sense of trust in others and in self that the attachment provides may also affect the child's development of intellectual and social skills. The growing child passes through many developmental stages, each requiring her to acquire critical skills and capacities.... The original bond of the child with the primary caretaker is believed to have an important continuing

---

7. *W. Va. Code*, 48–2–15(b)(1) [1986] provides in pertinent part:

    > The court may provide for the custody of minor children of the parties, subject to such rights of visitation, both in and out of the residence of the custodial parent or other person or persons having custody, as may be appropriate under the circumstances.

8. *See* Freed & Walker, "Family Law in the Fifty States: An Overview," 22 *Fam.L.Q.* 367 (1989). *See, e.g.,* Ariz.Rev.Stat.Ann. § 25–332 (1986); Cal.Civ.Code § 4608 (West 1983 & Supp.1987); Fla.Stat.Ann. § 61.13 (West 1984); Ind.Code Ann. § 31–1–11.5–21 (Burns 1986); Ky.Rev.Stat. Ann. § 403.270 (Bobbs–Merrill 1984); Md.Fam. Law Code Ann. § 5–203 (1984 & Supp.1986); Mich.Stat.Ann. § 25.312(3) [M.C.L. § 722.23] (Callahan 1984); Mo.Ann.Stat. § 452.375 (Ver-

non 1986); N.J.Stat.Ann. § 9:2–4 (West 1976); Tenn.Code Ann. § 36–6–101 (1986); Tex.Fam. Code Ann. § 14.07 (Vernon 1986); Wis.Stat. Ann. § 767.24 (West 1981).

9. Despite popular perceptions to the effect that child abusers are predominantly male, women are just as likely to be abusers as are men. *See* D. Gil, *Violence Against Children* 117 (1970). *See also* Schwartz, Book Review, 2 *Yale L. & Pol'y Rev.* 179, 183–84 (1983).

10. *See* J. Goldstein, A. Freud and A. Solnit, *Before the Best Interests of the Child* 31–35 (1979); Wexler, "Rethinking the Modification Child Custody Decrees," 94 *Yale L.J.* 757, 799 (1985); Leonard & Provence, "The Development of Parent–Child Relationships and the Psychological Parent," 53 *Conn. B.J.* 320, 326 (1979).

effect on the child's ability to pass through each stage with success.[11]

Thus, the young child's welfare can be best served by preserving the child's relationship with the primary caretaker parent. Without a presumption in favor of the primary caretaker parent, the process—or even the prospect—of sorting out custody problems in court affects those problems, usually for the worse.

The unpredictability of courts in divorce matters offers many opportunities for a parent (generally the father) to minimize support payments and gain leverage in settlement negotiations. The most effective, and hence the most generally used, tactic is to threaten a custody fight. The effectiveness of the threat increases in direct proportion to the other parent's unwillingness to give up custody. Because women, much more than men, are preeminently interested in custody, seemingly gender-neutral custody rules actually serve to expose women to extortionate bargaining at the hands of their husbands.

A sizable body of research has confirmed that mothers are much more likely than fathers to feel close to their children. In 1977, Sharon Araji of Washington State University published a study entitled "Husbands' and Wives' Attitude–Behavior Congruence on Family Roles."[12] In that study, she asked her subjects their opinion on the proper division of family labor and then asked how such work was in fact divided in their households. More than two-thirds stated that child-care labor *should* be equally divided. When asked about actual performance, however, those same people overwhelmingly responded that it was the woman in their household who bore the brunt of child-care duties. Shared responsibility for child care would seem more a cosmopolitan pretension than a reality in most settings.

Another study done at the University of Nevada that same year[13] found that the division of labor within households is resistant to change. Furthermore, the responsibility for child care was among the duties least often shared. To the extent that husbands participated in child care at all, they were more likely to be involved in playing, baby-sitting and disciplining rather than in such day-to-day tasks as feeding, changing and bathing. The Nevada study is also significant in that it examined cohabiting couples as well as married ones. One might expect that those cohabiting would show more progressive attitudes in the division of domestic responsibilities, but the study found that such couples nonetheless hewed closely to the sexual stereotypes of the world in which they grew up.

Such was also the case with couples in which the women were highly career-oriented.[14] Even among such couples, it was

11. Chambers, "Rethinking the Substantive Rules for Custody Disputes in Divorce," 83 *Mich. L.Rev.* 477, 530 (1984). Professor Chambers also notes that these observations present the strongest case for a presumption of custody of young children with the primary caretaker parent. However, Professor Chambers believes that the substantial emotional bonds a child forms with secondary caretakers are undervalued.

12. 39 *J.Marr. & Fam.* 309 (1977).

13. Stafford, Backman & diBona, "The Division of Labor Among Cohabiting and Married Couples," 39 *J.Marr. & Fam.* 43 (1977). *Cf.* Kotkin, "Sex Roles Among Married and Unmarried Couples," 9 *Sex Roles* 975 (1983) (study finding conventional allocation of household tasks and male career precedence among married and cohabiting couples planning to marry but more egalitarian attitudes among cohabiting couples not planning to marry); Doerfler & Krammer, "Workaholism, Sex and Sex Role Stereotyping Among Female Professionals," 14 *Sex Roles* 551, 559 (1986) (quoting an unpublished study of university faculty that found married working faculty women with children worked an average of 108.3 hours per week).

14. Heckman, Bryson & Bryson, "Problems of Professional Couples: A Content Analysis," 39 *J.Marr. & Fam.* 323, 327–29 (1977). *See also* Project, "Law Firms and Lawyers with Children: An Empirical Analysis of Family/Work Conflict," 34 *Stan.L.Rev.* 1263 (1982) (The study shows that women law students expected to spend considerably more time than male students in performing child care tasks and their job considerations were also influenced.); Baber & Monaghan, "College Women's Career and Motherhood Expectations: New Options, Old Dilemmas," 19 *Sex Roles* 189, 201 (1988) (The study found that college educated women even in traditionally male dominated fields, expect to

found, both spouses generally assumed that the woman would be the one primarily responsible for child care. A crucial finding was that the decision to take primary responsibility for the children was frequently a voluntary one for women, who saw parenting as a fundamental element of a successful female life.

Still, just because most women strongly desire custody and most men do not doesn't mean that such is the case in every instance. Fathers who want to retain the companionship of their children and who believe that they would be better single parents than their wives expect the judicial system to operate on the basis of more refined principles than simple statistically-based discrimination.[15]

Fathers are now demanding that courts award custody based on an individualized inquiry into their specific situations. This appears reasonable on its face. But when we understand the costs of such an inquiry, and appreciate as well just how much sinister bargaining is carried out in the shadow of such an unpredictable, case-specific system, we must think again. And, as part IV, *infra*, will demonstrate, our conclusions in this regard are now shared by a growing number of states.

## II

The individualized approach might be ideal if it were costless and if courts actually considered the relative merits of the parents in each case. In fact, however, the individualized approach is intrusive, time-consuming and inherently distortive in its effect. And, because the vast majority of divorces are settled without ever reaching court,[16] very few custody arrangements receive even the dubious benefit of a judicial determination that they are in the "best interests of the child."

Under the individualized approach to the "best interests of the child" standard, custody, when contested, goes to the parent who the court believes will do a better job of child rearing. This standard is a substitute for the maternal preference rule or its gender-neutral successor, the primary caretaker parent rule. It operates as well in those states retaining a weak maternal preference, with that preference being only a tie breaker. In order to assign custody, the court must explore the dark recesses of psychological theory to determine which parent will, in the long run, do a better job.

However, this undertaking inevitably leads to the hiring of expert witnesses—psychologists, psychiatrists, social workers and sociologists.[17] These experts are paid by the parties to demonstrate that one or the other (coincidentally, always the client) is the superior parent in light of his or her personality, experience and aptitude for parenting. The experts will advance the theory that whatever positive aspects of personality their client possesses are preeminently important to successful single-parent child-raising.[18]

Expert witnesses are, after all, very much like lawyers: They are paid to take a set of facts from which different inferences may be drawn and to characterize those facts so that a particular conclusion follows. There are indeed cases in which a mother or father may appear competent on the surface, only to be exposed after per-

have primary responsibility for young children.); A 1987 New York Times Poll showed that women "are still the primary care-givers." *N.Y.T.*, February 24, 1988 at 1, col 1.

15. Chambers, *supra* note 11, at 561.

16. Over 90 percent of divorces are uncontested. This means that the granting of the divorce is *pro forma* and routine, with all of the important decisions made out of court—usually in law office negotiations. In the case of middle-class and rich clients, failure to contest usually means a settlement has been reached. *N.Y. Law Journal,* July 11, 1984, at 1, col. 1.

17. *See* Bolocofsky, "Use and Abuse of Mental Health Experts in Child Custody Determinations," 7 *Behav.Sci. & L.* 197 (1989) (indicating an overreliance by mental health professionals on questionable sources of data and the inadequacies of clinical judgment in child custody evaluations).

18. *See* Ziskin & Faust, "Psychiatric and Psychological Evidence in Child Custody Cases," 25 *Trial* 44 (August 1989) for a discussion on the use of scientific and professional research to dispute the expertise of mental health professionals and to question the validity of their evaluations.

functory inquiry as a child abuser. Under truly careful inquiry, such discoveries might be made more often. Such careful inquiry, however, is almost impossible in the real world because it requires experts who combine competence and integrity in a way that is seldom found, at least in court-rooms. The side with the stronger case can afford to hire only competent experts with profound integrity; the side with the weaker case, on the other hand, wants im-pressively glib experts who are utterly de-void of principles. When both parents are good parents, the battle of the experts can result only in gibberish.

No issue is more subject to personal bias than a decision about which parent is "bet-ter." Should children be placed with an "open, empathetic" father or with a "stern but value-supporting" mother? The deci-sion may hinge on the judge's memory of his or her own parents or on his or her distrust of an expert whose eyes are avert-ed once too often. It is unlikely that the decision will be the kind of individualized justice that the system purports to deliver.

Even when the judge, like most judges, has an intuitive grasp of the difference between good testimony and bunkum, the process is itself destructive. Judges in states that have a "best interests of the child" standard or a weak maternal pre-sumption must allow days of testimony from a parade of highly paid experts be-fore finally rendering a decision. In most cases, the judge ends up deciding that the mother is closer to the children and awards custody accordingly. Yet the hearings, as generally irrelevant as they are to the out-come, are bad in and of themselves because

the very process of preparing experts to testify increases the hardship for all con-cerned. *See Garska, supra,* 167 W.Va. at 65, 278 S.E.2d at 361.

In order for a psychiatrist or psycholo-gist to testify in court about so-called per-sonality integration or similar psychologi-cal phenomena, the expert must interview parents and children, conduct tests and per-haps observe the litigants in a family set-ting. This very exercise can undermine the mental health of the children as well as the emotional stability of the parents. *Id.* When an elaborate custody battle is antici-pated, the experts will create painful situa-tions in their efforts to substantiate the testimony they have been paid to give. In much the same way that an artillery bat-tery can "liberate the hell out of" a peace-ful hamlet, experts can create emotional imbalances in the very children they are trying to "protect." [19]

In the child custody context, children fall into one of three groups, depending on their age. Children under six years of age are called "children of tender years": They are the most dependent on their parents, but they usually cannot articulate an intelli-gent opinion about their custody. Children between six and fourteen are also depend-ent on their parents, but they can usually articulate a preference regarding custody arrangements and explain their reasons.[20] By the age of fourteen a child takes on many of the qualities of an adult; in most cases, unless geography interferes, a child over fourteen will decide for himself or herself the parent with whom he or she wants to live, regardless of what a court says.[21]

**19.** S. Goldstein & A. Solnit, *Divorce and Your Child* 64 (1984). *See also* Chambers, *supra* note 11, at 569. "Litigation imposes heavy emotional and financial costs on families. Unlike most other forms of litigation the parties to this dis-pute generally continue to deal with each other after it is over: The 'loser' is entitled to visita-tion over a long period of years."

**20.** In *J.B. v. A.B., supra* note 5, 161 W.Va. at 340, 242 S.E.2d at 253, we stated: "The concept of 'tender years' is somewhat elastic; obviously an infant in the suckling stage is of tender years, while an adolescent fourteen years of age or older is not.... Between the two extremes are

children who are more or less capable of ex-pressing a preference concerning their custody."

**21.** "... [A]n adolescent fourteen years of age or older ... has an absolute right under *W.Va. Code,* 44–10–4 [1923] to nominate his own guardian." *J.B. v. A.B., supra* note 5, 161 W.Va. at 340, 242 S.E.2d at 253; *Shimp v. Shimp,* 179 W.Va. 215, 366 S.E.2d 663 (1988); Ga.Code Ann., 19–9–1(a) (Supp.1988) (child fourteen or older may choose parent unless parent is unfit); Ohio Rev.Code Ann. 3109.04 (Baldwin 1983) (child twelve years or older may choose parent unless court finds parent unfit).

Children over the age of six might seem to be the best available experts on the subject of how the parents and children get along. Usually, however, children do not want what is best for them; they want what is pleasant.[22] If children are permitted to influence decisions about custody simply by stating a preference, the parents are placed in the position of being competitive bidders in a counterfeit currency. For the children, the results are seldom positive.[23]

That is because the litigation process is not neutral, but has its own peculiar and dangerous side effects. Unlike other litigation that sorts out rights and obligations based on facts frozen in time, custody decisions are predictions of what is best for the child—predictions based on facts constantly changing in part as a result of the litigation process.[24] If the divorce drags through the trial and appellate courts for two years, the lawsuit itself may wound or destroy the very children whose welfare is supposed to be at its center. In addition, money that would have been available to ease the transition from joint household to separate households is diverted instead to lawyers, court fees and expert witnesses.

Once a custody battle is contemplated, the relationship between parents and children usually changes for the worse. The overriding need to prepare for court will dominate the lives of both parents and if the children are to be polled—either directly through court testimony or indirectly through the probing of experts—each parent is probably going to attempt to poison the other's well.

The degree to which children suffer during divorce is a widely discussed subject.[25] The slowly grinding machinery of the courts inevitably exacerbates the emotional stresses that result from the simple fact of divorce. Among the damaging effects of custody litigation are uncertainty, painful psychological probing (e.g., "Who do you love more, Mommy or Daddy?"), and competitive parental bribery. The magnitude of these effects is a direct function of the time it takes to conclude the proceedings.

Damage in these matters is magnified by the different meaning time has for children as opposed to adults. Events that transpired in childhood can be remembered in meticulous detail, while similar events, for an adult, are largely a blur. When a person is forty, a year represents one-fortieth of his or her life; for someone who is five, a year represents one-fifth. Divorce is by its very nature traumatic not only in terms of the mother's and father's separation but also in terms of new male and female companions for each entering the scene. If the children have no idea with whom they will live or under what terms or even where, the consequent uncertainty is likely to undermine their ability to function. Their relations with other children may suffer, their ties to the community may be threat-

22. Scott, Reppucci & Aber, "Children's Preference in Adjudicated Custody Decisions," 22 *Ga. L.Rev.* 1035, 1055 (1988) (A child's preference may be influenced by "transitory anger at the 'guilty' parent" or the entertainment by a "weekend" parent.).

23. Mnookin & Kornhauser, "Bargaining in the Shadow of the Law," 88 *Yale L.J.* 950 (1979).

24. The sheer complexity of custody decisions means that the measurement process itself changes the thing that is measured. Lack of neutrality in measuring things is a recurring problem in many areas of human endeavor. In physics the problem is known as the Heisenberg uncertainty principle—which refers to Werner Heisenberg's discovery that it is impossible to measure both the speed and the location of an electron simultaneously because the measuring devices themselves affect the speed and location being measured. Heisenberg, "Uber den anschaulichen inhalt der quantentheoretische Kinematik und Mechanik," 43 *Z.Phys.* 172 (1927); see also A. Zee, *Fearful Symmetry: The Search for Beauty in Modern Physics* 140 (1986). A similar principle applies to divorce cases—measuring family problems usually makes these problems worse.

25. *See, e.g.,* J. Despert, *Children of Divorce* 91–150 (1962); J. Goldstein, A. Freud & A. Solnit, *Beyond the Best Interests of the Child* 37–39 (rev. ed. 1979); S. Goldstein, *supra* note 19, at 8; J. Westman, *supra* note 3, at 273–75, 287; Wallerstein, "The Child in the Divorcing Family," in *The Rights of Children* 99, 99–108 (J. Henning ed. 1982); Kirshner, "Child Custody Determination," in *The Rights of Children* 117, 125–26 (J. Henning ed. 1982).

ened, and the stress they are under can cause academic failure.[26]

The harms of courtroom custody battles happen only in a relatively small minority of divorces because the vast majority of divorce cases are settled out of court.[27] However, the *possibility* of a courtroom custody battle also causes problems in out-of-court settlement negotiations.

Divorce decrees are typically drafted for the parties after compromises reached through private negotiation. These compromises are then approved by a judge, who generally gives them only the most perfunctory review. The result is that parties (usually husbands) are free to use whatever leverage is available to obtain a favorable settlement. In practice this tends to mean that husbands will threaten custody fights, with all of the accompanying traumas and uncertainties discussed above, as a means of intimidating wives into accepting less child support, alimony or distribution of marital property than is sufficient to allow the mother to live and raise the children appropriately as a single parent.[28] To some extent the uncertainty in the amount of child support payments is limited by the application of the guidelines required by *W.Va.Code*, 48A–2–8 [1986].[29] The guidelines for child support awards are set forth in 6 *W.Va.Code of State Rules* 78–16–1 to 78–16–20 (effective May 2, 1988).[30] Because women are usually unwilling to accept even a minor risk of losing custody, however, such techniques, despite the guidelines, are generally successful because the guidelines establish *minima* and do not apply to alimony or property distribution.

Under any purportedly gender-neutral system, women on statistical average come out of divorce settlements with the worst of all possible results: They get the children, but insufficient money with which to support them. They are forced to scrape along to support their families at inadequate standards of living, and the children are forced to grow up poor, or at least poorer than they should be. Yet the negotiation dynamic is seldom discussed, despite its importance in promoting the growth of a rapidly-expanding class of poor people, the female-headed household.

An important reason that little attention has been given to the effect of in-court rules on out-of-court bargaining is that views on divorce are informed more by wishful thinking than by the facts of life. Many people (especially men) begin with a political conviction that women *ought* to be equal to men economically, from which they leap to the insupportable conclusion that women *are* equal to men economically. It then follows that women can support children as well as men can and that whoever wants the children can pay for them.

In the real world, however, women are much poorer than men, and this pattern is highly resistant to change.[31] The cost of

**26.** J. Despert, *supra* note 25, at 116–50; J. Goldstein, A. Freud & A. Solnit, *supra* note 25, at 37–39. *See also* sources cited at note 25, *supra. Cf.* Okpaku, "Psychology: Impediment or Aid in Child Custody Cases?" 29 *Rutgers L.J.* 1117, 1140–41 (1976) (lack of conclusive empirical research in the area of children's reaction to custodial discontinuity); Dembitz, "Beyond Any Discipline's Competence" (Book Review), 83 *Yale L.J.* 1304, 1309–11 (1974) (continuity of the custodial arrangement not always of supreme importance) (reviewing J. Goldstein, A. Freud & A. Solnit, *Beyond the Best Interests of the Child* (1973)).

**27.** *See* note 16, *supra.*

**28.** *See Garska, supra* in text, 167 W.Va. at 66–68, 278 S.E.2d at 360–62, for a discussion of the Solomon Syndrome—the phenomenon that "the parent who is most attached to the child will be willing to accept an inferior bargain."

**29.** Each state is required by federal law to establish guidelines for child support amounts, effective 1 October 1987. 42 *U.S.C.* 667 (Supp. IV 1986). *See also* 45 *C.F.R.* 302.56 (1988).

**30.** *See Holley v. Holley,* 181 W.Va. 396, 382 S.E.2d 590 (1989) (requiring the amount of child support to be in accordance with the established state guidelines, unless written, specific reasons for not following the guidelines are provided). *See also Kathy L.B. v. Patrick J.B.,* 179 W.Va. 655, 371 S.E.2d 583 (1988) (holding a father liable for support from the date of his child's birth).

**31.** "[Single] [w]omen maintaining families are far more likely to be unemployed than husbands or wives, their average (median) family income is less than half that of married couples, and they are five times as likely to be in poverty." Bureau of Labor Statistics, U.S. Dep't of

child care itself is a major economic burden placed on single mothers. Single mothers, who start with unequal earning power, also provide child care—care that involves great amounts of time that could be spent earning money.[32] But the unfairness only begins there, as so many women are forced to accept lower child support and alimony payments in order to be sure of getting the children (and the accompanying economic burden) at all.

The everyday occurrence of children being traded for money should be sufficient in and of itself to prompt a reevaluation of a system that turns custody awards into bargaining chips. The fact that such trading also has contributed to the impoverishment of women makes the need for change still more urgent. What is needed is a standard for custody awards that assures the welfare of the child without encouraging such pernicious bargaining, but which also does not discriminate by gender.

### III

Most of the problems of child custody litigation can be avoided by not litigating the issue in the first place. It is here that the wisdom of the old maternal preference, or its gender-neutral alternative, the "primary caretaker parent presumption," becomes apparent. The primary caretaker presumption severely limits opportunities for using child custody litigation as a bargaining chip.

■ West Virginia law does not permit a maternal preference. But we do accord an explicit and almost absolute preference to the "primary caretaker parent" of young children, *Garska, supra,* 167 W.Va. at 68, 278 S.E.2d at 362. We have defined the "primary caretaker" as the parent who:

> ... has taken primary responsibility for, *inter alia,* the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9) educating, i.e. religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic.

*Id.,* 167 W.Va. at 69–70, 278 S.E.2d at 363.

This list of criteria usually, but not necessarily, spells "mother." That fact re-

---

Labor, *Women at Work: A Chartbook* 26 (1983). This gap seems to be widening. U.S. Commission on Civil Rights, *Disadvantaged Women and Their Children: A Growing Crisis* 6 (1983) (hereinafter cited as "Disadvantaged Women"). *See also* Bureau of Labor Statistics, U.S. Dep't of Labor, *Women & Work* (August 1987) (noting that ninety percent of persons on welfare are women and children); *N.Y.T.,* February 26, 1988 at 1, col. 1, reporting a study by the Congressional Budget Office that found although median adjusted family income overall rose twenty percent from 1970 to 1986, family income for single mothers with children rose only two percent.

**32.** Of economically active women ages 25–34 with no spouse present, those without children worked an average of 1,966 hours annually, while those with children worked from 1,171 hours (for those with four or five children) to 1,775 hours (for those with one child). Smith, "Estimating Annual Hours of Labor Force Activity," 106 *Monthly Lab. Rev.* 13, 19 (Feb. 1983).

This hardship is compounded in several ways. First, in order to work full-time, working mothers must obtain child care, which (unless relatives or friends are available regularly) is always expensive and often prohibitively so. Disadvantaged Women, *supra* note 31, at 12–13, 63. Second, in general "[w]omen are segregated in a few occupations that pay low wages and have little promotion potential." *Id.* at 63. And third, there is evidence that the pressures of raising a family alone and beating back poverty are major sources of emotional stress. *Id.* at 52. Note also that women acting as single parents "are also in the category of persons who are least likely to receive preventive health care or adequate care during illness." *Id.* Men, on the other hand, largely avoid the economic pitfalls afflicting divorced women. *Id.* at 12. For more on the psychological strains suffered by working women, *see* J. Westman, *supra* note 3, at 105, and Johnson & Johnson, "Attitudes Toward Parenting in Dual Career Families," 134 *Am.J. Psychiatry* 391 (1977).

flects social reality; the rule itself is neutral on its face and in its application. When women pursue lucrative and successful careers while their husbands take care of the children, those husbands receive the benefit of the presumption as strongly as do traditional mothers. Furthermore, where both parents share child-rearing responsibilities equally, our courts hold hearings to determine which parent would be the better single parent.[33] This latter situation is rare, but is evidence of the actual gender-neutrality of the primary caretaker presumption.

Our rule inevitably involves some injustice to fathers who, as a group, are usually not primary caretakers. There are instances when the primary caretaker will not be the better custodian in the long run. Yet there is no guarantee that the courts will be able to know, in advance and based on the deliberately distorted evidence that characterizes courtroom custody proceedings, when such is the case. And, notwithstanding its theoretical imperfections, the primary caretaker parent presumption acknowledges that exhaustive hearings on relative degrees of parenting ability rarely disclose any but the most gross variations in skill and suitability. Permitting such hearings inevitably has distortive effect on the parties' behavior, and is likely to lead to potentially disastrous emotional trauma for all concerned if the case goes to court.

Any rule concerning custody matters will be gender-biased, in effect if not in form. An allegedly gender-neutral rule that permits exhaustive inquiry into relative degrees of paternal fitness is inevitably going to favor men in most instances. This bias follows from the observed pattern that in consensual divorces where there is no fight over money—either because there isn't any or because there is enough to go around—women overwhelmingly receive custody through the willing acquiescence of their husbands. Experience teaches that if there is any chance that the average mother will

lose her children at divorce, she will either stay married under oppressive conditions or trade away valuable economic rights to ensure that she will be given custody.

■ In West Virginia we intend that generally the question of which parent, if either, is the primary caretaker of minor children in a divorce proceeding is to be proven with lay testimony from the parties themselves and from teachers, relatives and neighbors. In most cases, the question of which parent does the lion's share of the chores can be answered satisfactorily and quickly. Once the primary caretaker has been identified, the only question is whether that parent is a "fit parent." In this regard, the court is not concerned with assessing relative degrees of fitness between the two parents such as might require expert witnesses, but only with whether the primary caretaker achieves a passing grade on an objective test. That issue does not require experts.

■ To be a fit parent, a person must: (1) feed and clothe the child appropriately; (2) adequately supervise the child and protect him or her from harm; (3) provide habitable housing; (4) avoid extreme discipline, child abuse, and other similar vices; and (5) refrain from immoral behavior under circumstances that would affect the child. In this last regard, restrained normal sexual behavior does not make a parent unfit. The law does not attend to traditional concepts of immorality in the abstract, but only to whether the child is a party to, or is influenced by, such behavior. Whether a primary caretaker parent meets these criteria can be determined through nonexpert testimony, and the criteria themselves are sufficiently specific that they discourage frivolous disputation.[34]

Furthermore, since *J.B. v. A.B., supra* note 5, we have divided children into the three age groups.[35] With regard to children of tender years, the primary caretaker presumption operates absolutely if the pri-

---

33. *Garska, supra* in text; *T.C.B. v. H.A.B.,* 173 W.Va. 410, 317 S.E.2d 174 (1984) (upholding a finding of joint primary caretakers and an award of custody to the father).

34. *Garska, supra* in text, 167 W.Va. at 70, 278 S.E.2d at 361.

35. *See* part II, *supra.*

mary caretaker is a fit parent. However, with those children able to formulate an intelligent opinion about their custody, our rule becomes more flexible. In exceptional cases when the trial judge is unsure about the wisdom of awarding the children to the primary caretaker, he or she may ask the children for their preference and accord that preference whatever weight he or she deems appropriate. Such an interview, because of the problems in asking children about their parental preference, should not, however, be routine and neither party may demand such an interview as a matter of right. When the children's testimony is necessary, the trial judge should seek to minimize the damage by talking to the children on record but outside their parents' presence. Thus, the "experts" who can rebut the primary caretaker presumption are principally the children, although in extraordinary circumstances a judge may seek or allow expert testimony. The judge is not, however, required to hear the testimony of the children, and will usually not do so, particularly if he or she suspects bribery or undue influence. Nonetheless, by allowing the children to be acceptable experts in our courts, an escape valve is provided in unusually hard cases.

Finally, once a child reaches the age of fourteen, the child is permitted to name his or her guardian if both parents are fit.[36] Often, as might be expected, this means that the parent who makes the child's life more comfortable will get custody; however, there is little alternative because children over fourteen who are living where they do not want to live will become unhappy and ungovernable anyway. In all three cases, the parent who receives custody is primarily responsible for making decisions concerning the child and for providing the child's permanent home. The other parent, however, is usually accorded liberal visitation rights, including the right to have the child during holidays, part of the summer, and some weekends.

Although the primary caretaker parent presumption may appear cut-and-dried and insufficiently sensitive to the needs of indi-vidual children, it serves the welfare of the child by achieving stability of care in the child's life, reducing the uncertainty of custody decisions, limiting the invasiveness of the custody determination process and reducing the expense of domestic litigation. Because litigation *per se* can be the cause of serious emotional damage to children (and to adults), we consider the primary caretaker parent presumption to be in the best interests of children. Even more important, children cannot be used as pawns in fights that are actually about money because a lawyer can tell a primary caretaker parent that, if fit, that parent has *absolutely no chance* of losing custody of very young children. The result is that questions of alimony, property distribution, and child support are settled on their own merits.

### IV

When we adopted the primary caretaker presumption in *Garska*, only one other jurisdiction relied upon a determination of primary caretaker in reaching custody decisions. *Garska, supra*, 167 W.Va. at 69, n. 10, 278 S.E.2d at 357, n. 10, citing *Matter of Marriage of Derby*, 31 Or.App. 803, 571 P.2d 562 (1977), modified on other grounds, 31 Or.App. 1333, 572 P.2d 1080 (1977). Since then the Supreme Court of Minnesota, citing *Garska*, adopted a primary caretaker parent presumption for custody of young children. *Pikula v. Pikula*, 374 N.W.2d 705 (Minn.1985). Justice Wahl in *Pikula, id.* at 711, reasoned that the primary caretaker presumption secured the best interests of the child by protecting the psychological bonding. Justice Wahl also noted that the "uncertainty of other indicia of a child's best interest ... and the pressing need for coherent decision making on the trial court level and for effective appellate review" required the primary caretaker presumption. *Id.* at 713. *Sefkow v. Sefkow*, 427 N.W.2d 203 (Minn.1988), reaffirmed *Pikula*. In order to preserve the presumption in favor of the primary caretaker, a strong showing of parental unfitness was required to grant custody to the

---

**36.** *See* note 21, *supra*.

other parent. *Tanghe v. Tanghe,* 400 N.W.2d 389 (Minn.App.1987).

North Dakota recently considered the primary caretaker presumption but determined that none of the statutory factors should be dispositive. *Gravning v. Gravning,* 389 N.W.2d 621, 622 (N.D.1986). In her dissent, Justice Levine, citing *Garska,* argued in favor of the primary caretaker preference because the child's best interest was to remain in the primary caretaker's custody and the "benefits of the primary caretaker rule far outweigh any baggage." *Id.* at 625.[37]

Both Ohio and Pennsylvania cited our primary caretaker presumption. *In re Maxwell,* 8 Ohio App.3d 302, 456 N.E.2d 1218 (1982), required strong consideration be given to the factor of primary caretaker to assure the continuation of the care. *Thompson v. Thompson,* 31 Ohio App.3d 254, 511 N.E.2d 412 (1987), noted that consideration was given to primary caregiver even though the term was not used. *Com. ex rel. Jordan v. Jordan,* 302 Pa.Super. 421, 448 A.2d 1113, 1115 (1982), held that "the role of primary caretaker, without regard to the sex of the parent, is a substantial factor which the trial judge must weigh in adjudicating a custody matter where the child is of tender years." *Jordan* then noted the *Garska* factors for identifying the primary parent. *Id.*

Cases in other jurisdictions that have recognized the relationship between the primary caretaker parent and the child but have refused to grant that factor a presumption or preference include: *Burchard v. Garay,* 42 Cal.3d 531, 541, 229 Cal.Rptr. 800, 806–07, 724 P.2d 486, 492–93 (1986) (stressing "the importance of stability and continuity in the life of a child, and the harm that may result from disruption of established patterns of care and emotional bonds," awarded custody of the 2 year old child to the primary caretaker); *Agudo v. Agudo,* 411 So.2d 249 (Fla.App.1982) (awarding custody of a seventeen-month-old to the primary caretaker based on expert testimony concerning the importance of the psychological bond); *Crum v. Crum,* 122 A.D.2d 771, 505 N.Y.S.2d 656 (1986) (holding that although a finding of primary caretaker should be considered that factor alone was not determinative of custody); *Pusey v. Pusey,* 728 P.2d 117 (Utah 1986), later proceeding 750 P.2d 599 (1988) (recognizing primary caretaker as an important factor for determination of child custody).

The following also have recognized the role of the primary caretaker as relevant to custody: *Smith v. Smith,* 294 S.C. 194, 363 S.E.2d 404, 406 (App.1987) (upholding custody award to the primary caretaker who had custody of the children since the separation; "latter factor alone supports the trial court's decision"); *Gordon v. Gordon,* 577 P.2d 1271 (Okl.1978), *cert. denied* 439 U.S. 863, 99 S.Ct. 185, 58 L.Ed.2d 172 (reversing custody award to the father when the mother was shown to be the primary caretaker); *Burleigh v. Burleigh,* 200 Mont. 1, 650 P.2d 753 (1982) (affirmed custody of two minor children with the mother based on evidence that she was the primary person involved in their care, education and rearing); *Leach v. Leach,* 660 S.W.2d 761 (Mo.App.1983) (upholding custody award to the primary caretaker father although contrary to the tender years presumption); *Marlatt v. Marlatt,* 427 So.2d 1285 (La. App.1983) (awarded custody to the father who was the primary "nurturing parent").[38]

37. *See* O'Kelly, "Blessing The Tie That Binds: Preference for the Primary Caretaker as Custodian," 63 *N.D.L.Rev.* 481 (1987), for a thoughtful argument in favor of North Dakota's adopting a preference for custody remaining with the primary caretaker parent. Professor O'Kelly concluded that although the results in several noted North Dakota child custody cases would have remained unchanged under a primary caretaker preference, the opinion rationales would change and the private ordering in other cases by negotiation and mediation would be different. *See*

also *Von Bank v. Von Bank,* 443 N.W.2d 618 (N.D.1989), noting Professor O'Kelly's article but declining to give presumptive weight to the primary caretaker.

38. J. Atkinson, *Modern Child Custody Practice* 239 (1986), reports that in 1982 and 1983 appellate courts of at least 20 states favored custody for primary caretakers. *See* Annotation, "Primary Caretaker Role of Respective Parents as Factor in Awarding Custody of Child," 41 *A.L.R.4th* 1129 (1985 & Supp.1989).

Other courts have implicitly considered the role of primary caretaker and have awarded custody to the nurturing parent, or the parent who was responsible for the child. *See In re Marriage of Leopando,* 106 Ill.App.3d 444, 62 Ill.Dec. 340, 435 N.E.2d 1312, *aff'd* 96 Ill.2d 114, 70 Ill.Dec. 263, 449 N.E.2d 137 (1983); *Anderson v. Anderson,* 121 Ariz. 405, 590 P.2d 944 (App.1979); *Nale v. Nale,* 409 So.2d 1299 (La.App.1982) (superceded by a presumption in favor of joint custody according to *Lake v. Robertson,* 452 So.2d 376 (La.App. 1984)).[39]

Many jurisdictions have turned to joint custody to solve divorce-related custody problems.[40] Under joint custody, divorced parents have equal time with the children and equal say in decisions about their schooling, religious training and lifestyle.[41] Joint custody, however, does not solve the problem of extortion in the settlement process because many mothers find shared custody as unacceptable as complete loss of custody.[42]

Joint custody works well when both parents live in the same neighborhood or at least in the same city, and so long as they can cooperate on child-rearing matters. Divorcing couples on their own often agreed to joint custody in the past, long before court-ordered joint custody became a public issue. When joint custody is by agreement, the same cooperative spirit that animated the underlying agreement will usually allow the parents to rear a child with no more antagonism than is experienced in most married households.

Voluntary joint custody, however, must be distinguished from court-ordered joint custody. A court can order that custody be shared, but it cannot order that the parents stop bickering, stop disparaging one another, or accommodate one another in child-care decisions as married persons would. And if parents do not live close to one another, joint custody can place an intolerable strain on a child's social and academic life if one parent is not willing to allow the other to supply a more-or-less permanent home.[43]

▆ Furthermore, parents must constantly give permission for one thing or another. Who decides whether the child can have a driver's license at age sixteen? Who decides when the child can date, under what conditions, and with whom? When the parents violently disagree—and particularly when they disagree because there are continuing fights left over from the marriage—the child is likely to be left hopelessly confused as the parents are played off one against the other. We do not authorize court-ordered joint custody today over the objection of a primary caretaker parent, although parents may agree to such an arrangement. As we said in Syllabus point 4 of *Lowe v. Lowe,* 179 W.Va. 536, 370 S.E.2d 731 (1988):

> A cardinal criterion for an award of joint custody is the agreement of the parties and their mutual ability to co-operate in reaching shared decisions in matters affecting the child's welfare.

## V

▆ In the present case, the record established that Mrs. M. was the primary

---

**39.** *See* Annotation, *supra* note 38, at 1138–41.

**40.** Over half the states have adopted legislation dealing with joint custody awards within the last several years. *See* Scott & Derdyn, "Rethinking Joint Custody," 45 *Ohio St.L.J.* 455, 456 n. 5 (1984). Some laws require court approval of voluntary joint custody arrangement, absent unusual circumstances. Others authorize courts to enter joint custody orders over the objections of either or both parties. Some could be read as creating a legislative presumption for joint custody even over the objections of either or both parties. *Id.* at 457 n. 9, 471 n. 73.

**41.** Actually, in many cases one parent will provide the permanent residence of the child while

other aspects of child-raising are shared evenly. Generally, the parent with whom the child is staying at the time will make day-to-day decisions (e.g., permission for school outings), with major decisions being shared between the two. *See generally* Folberg & Graham, "Joint Custody of Children Following Divorce," 12 *U.C.D.L.Rev.* 523 (1979) (thoroughly documented discussion of joint custody plans, including history and prevailing attitudes).

**42.** *See* Chambers, *supra* note 11, at 567.

**43.** *See* text accompanying note 25, *supra.*

caretaker parent of the child. Mrs. M. (1) bathed, groomed and dressed the child, (2) purchased, cleaned and cared for his clothes, (3) organized and purchased his food, (4) secured medical attention, when needed, (5) missed work to nurse the child, and (6) put the child to bed, attended to him in the middle of the night and awakened him in the morning. We note that the father assisted in some of the cooking, and both parents were responsible for disciplining, educating and teaching general manners and elementary skills.

In Syllabus Point 4, *J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978), as modified by *Garska, supra*, 167 W.Va. at 70, 278 S.E.2d at 363, we discussed the relationship between a parent's adultery and parental fitness.

> Acts of sexual misconduct by a [primary caretaker], albeit wrongs against an innocent spouse, may not be considered as evidence going to the fitness of the [caretaker] for child custody unless [his or] her conduct is so aggravated, given contemporary moral standards, that reasonable men would find that [his or] her immorality, *per se*, warranted a finding of unfitness because of the deleterious effect upon the child of being raised by a [primary caretaker] with such a defective character.

Although the record contains evidence of three acts marital misconduct, two of which were adultery, there is no evidence that Mrs. M.'s marital misconduct was known to the child or damaged the child. We have repeatedly held that a "circuit court may not base a finding of parental unfitness solely on the ground that the parent is guilty of sexual misconduct." *Bickler, supra* note 2, 176 W.Va. at 409, 344 S.E.2d at 632. Mrs. M. testified that two of the instances occurred about midnight when the child was asleep and the third occurred after the child and his stepbrother left to visit a neighbor and was concluded before the children returned home. Although evidence of marital misconduct, this restrained normal sexual behavior does not make Mrs. M. an unfit parent.

The circuit court was clearly wrong in its position that the three instances of sexual misconduct, occurring over two years, warranted a finding of unfitness, without evidence establishing that the child was harmed or that the conduct *per se* was so outrageous, given contemporary moral standards, as to call into question her fitness as a parent. *J.B. v. A.B., supra* note 5, 161 W.Va. at 345, 242 S.E.2d at 256. The absence of such evidence requires reversal.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Wood County with respect to the granting of a divorce is affirmed, but with respect to the award of custody is reversed and this case is remanded with directions to enter an order consistent with this opinion.

Affirmed in part; Reversed in part; and Remanded with directions.