591 S.E.2d 177

**Erica HAGER, Plaintiff Below, Appellant,**

v.

**Travis HAGER, Defendant Below, Appellee.**

**No. 31325.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 28, 2003.

Decided Nov. 21, 2003.

Davis, J., dissented and filed opinion.

McGraw, J., dissented.

Charles R. Webb, Esq., Giatras & Webb, Charleston, for Appellant.

Boyce A. Griffith, Esq., Hamlin, for Appellee.

## PER CURIAM.

In the instant case we reverse a ruling of a circuit court judge sitting as a special family court judge, and return legal custody of a child to the child's mother.

### I.

Most of the convoluted procedural and substantive history of this contested divorce/child custody case, which has gone on since 1997, is of no importance to the substantive issues before this Court. Consequently we omit its recital.

### II.

The principal contested issue in the instant case has been, for a number of years, whether the appellant, who is the child's mother and who lives in Florida with her fiancé, is entitled to legal custody of her daughter—or whether the appellee, who is the child's father and who lives in Lincoln County, West Virginia, is entitled to custody.[1]

The father's principal ground for asserting that he should have custody has consistently been the alleged unfitness of the child's mother, and this claim has been primarily

---

1. The father lives with his parents, and the record and the findings of the lower court make it clear that it is the child's paternal grandparents and not the father who are raising the child. Prior to the parties' separation, the mother was the child's primary caretaker. "Custody" as used herein is a short-hand term for primary custodial and decision-making responsibilities, see W.Va.Code, 48–1–219, 220 [2001].

based upon an alleged danger to the child from the mother's fiancé. Leaving aside the mother's relationship with her fiancé, the record does not contain substantial evidence upon which a proper finding could be made that the mother, who was originally awarded custody, is not a fit parent.

The most recent ruling in this case on the custody issue was on June 21, 2002, by a circuit judge who had been designated as a special family court judge. The judge found, reviewing exceptions to a family law master's recommended order retaining custody in the father, that the mother's fiancé "... is a potentially violent person and places the infant child in harm's way, which fact is supported by police records of his violent criminal record and witnesses who testified to his reputation for violence."

The record discloses that the mother's fiancé was arrested in 1970, when he was 17, possibly for stealing, and that he was once fined $300.00 for cursing in public during a domestic dispute. We are not cited to any other evidence that supports the circuit court's finding of a "violent criminal record." The other evidence in the record that the father says shows that the fiancé is a "potentially violent person" and has a "reputation for violence" is in the form of anecdotal evidence from clearly biased witnesses. This evidence, at best, could support the conclusion that the fiancé has, on several occasions, used hot words and acted intemperately. It could not support a finding that the fiancé is in fact a dangerous and violent person.[2]

This Court stated in Syllabus Point 3 of *S.H. v. R.L.H.*, 169 W.Va. 550, 289 S.E.2d 186 (1982) that "neither remarriage nor an extramarital relationship *per se* raises any presumption against continued custody in the parent originally awarded such custody." In *Porter v. Porter*, 171 W.Va. 157, 159, 298 S.E.2d 130, 132 (1982), this Court stated that, "[t]here must also be a showing that the parent's relationship with another adult has a deleterious effect upon the child and that the child will materially benefit from the change of custody," evidence of which has been noticeably absent from the proceedings at bar.

In *J.B. v. A.B.*, 161 W.Va. 332, 345, 242 S.E.2d 248, 256 (1978), this Court stated that "[t]he award of child custody, however, should not be an exercise in the punishment of an offending spouse. In punishing the offending spouse one may also punish the innocent child, and our law will not tolerate that result."

In *Judith R. v. Hey*, 185 W.Va. 117, 405 S.E.2d 447 (1990), a circuit court directed that the mother had thirty days from the date of the hearing to either marry the man

---

**2.** The court's "violent fiancé" finding is rather straightforwardly undercut by the fact that the mother's currently ordered visitation with her daughter is substantial (it was increased by the court's June 21, 2002 order), is in the home where she lives with her fiancé, and is without any limitation reflecting his purported dangerousness. The evidence regarding the mother's fiancé also showed that he was a veteran of the United States Army and had completed two years at Marshall University as a business major; that he owned his own drywall business in Florida; that he employed approximately fifteen people in his business; that he had a payroll of approximately $15,000.00 a week to his employees; that his business equipment consisted of three trucks, cellular phones, and administrative services, for which the mother was employed at the company. He described their home as a stucco home with a two-car garage, three bedrooms, kitchen and two baths, 1,830 feet of heated space and 2,200 feet of total overall space; their home is financed through a VA loan; that his monthly mortgage payment was approximately $900.00 per month, and that the amount of his loan was $108,000.00 then outstanding; that he earned approximately $55,000.00 per year; that the name of his business was Drywall Systems, Inc.; and that it was incorporated as a Chapter S corporation. On cross-examination, the fiancé admitted that he was arrested when he was seventeen years old. He denied persistent questioning about whether he was ever arrested for DUI; he admitted that he was behind in his child support to his ex-wife, although he was placing funds in escrow. He testified that he was divorced in 1975, when he was approximately 23 years old, and had one child born of the marriage, the custody of whom was granted to his wife but later transferred to Mr. Ramey, who raised the child. He admitted that his ex-wife had accused him of harassment and that he was arrested at her home on one occasion; to none of which was the subject child a witness or involved in any remote way. The only cross-examination which had any relevance was to the effect that he had spent the night on occasion with the mother and the subject child in the same room after the divorce order was entered. He testified and the court specifically believed that he was unaware as to any prohibition against being around the child, until contempt proceedings had been filed.

with whom she was cohabiting or to move out and establish separate living arrangements for her and her daughter. In that case, the court further ordered that if neither alternative was met within such time period, custody of the parties' fourteen-year-old daughter would be granted to the father. This Court reiterated that a careful review of the whole record in the *Judith R.* case was void of any evidence that she was an unfit parent or that her conduct had created any deleterious effect on the child.

■ In the instant case, the mother was required, when she originally received custody, not to have her fiancé around the child. She violated this requirement. The record suggests that this requirement was grounded in the fact that she was not married to her fiancé, and not in any proven danger that the fiancé posed to the child.

For violating this requirement, the mother argues (and we agree), she was effectively "punished" by having her child's custody changed to the father/grandparents. When the mother sought to have this custodial ruling changed, the court refused—based upon the finding discussed herein that the fiancé posed a danger to the child.

We have reviewed the entire record, including the transcripts of numerous hearings, and we find that—even giving due deference to the fact that the lower tribunals saw the witnesses—the finding of the fiancé's dangerousness to the child is so contrary to the weight of the evidence that it cannot be sustained on appeal.

## III.

■ The father argues that the child is now "well-adjusted" in the father's parents' home, and we have no reason to doubt this claim. But this fact does not undercut the underlying error in this case of denying custody to the mother, based on an improper finding of her unfitness to have such custody, simply because she was living with her fiancé. The existence of "well-adjusted" conditions for a child—"facts on the ground" that are based on erroneous court determinations—simply cannot themselves carry the day in custodial determinations. There is

nothing in the record upon which it may be concluded that the child is not likely to also have a well-adjusted life in her mother's custody.

Based on the foregoing, we reverse the circuit court's order and award custody of the child to the appellant. We remand the case with instructions that the Family Court Judge of Lincoln County enter such order as is appropriate to promptly and peacefully effectuate a physical change of custody. Thereafter, both parties are to submit appropriate parenting plans, and proposals for visitation, financial arrangements, etc. and to participate in such proceedings as are determined to be proper by the Family Court Judge.

Reversed and Remanded.

Justice DAVIS dissents and reserves the right to file a dissenting opinion.

Justice McGRAW dissents.

DAVIS, J., dissenting.

In this proceeding, the Court was required to determine whether the lower court was correct in denying Erica Hager's (hereinafter referred to as "Ms. Hager") petition for "joint physical custody" of her child. Instead of addressing this very narrow issue, the majority awarded Erica Hager full custody of the child. In reaching this decision, the majority states, on the first page of its opinion, that: "Most of the convoluted procedural and substantive history of this contested divorce/child custody case, which has gone on since 1997, is of no importance to the substantive issues before this Court. Consequently we omit its recital." Ironically, the only way in which the majority could justify returning the child to Ms. Hager was by omitting *this convoluted procedural history.* For the reasons stated below, I respectfully dissent.

### A. The Majority Relied upon Facts Not Properly Before the Court

The majority found that the lower court erred by determining that Ms. Hager's boyfriend was a danger to her child. Therefore, the child should be returned to Ms. Hager. Simply put, this issue was not properly be-

fore the Court *in this appeal.* In 1999, the lower court awarded custody of the child to the child's father, Travis Hager (hereinafter referred to as "Mr. Hager"), after finding that Ms. Hager violated a previous order that her boyfriend have no contact with the child. Ms. Hager filed a petition for appeal to this Court challenging the custody decision. This Court denied the petition for appeal.

When this Court denied Ms. Hager's challenge to the order awarding custody of the child to Mr. Hager, the rulings established in that order became the law of the case. We recently explained the law of the case doctrine in *State ex rel. Frazier & Oxley v. Cummings,* 214 W.Va. 802, 808, 591 S.E.2d 728, 734, 2003 WL 22387720 (Oct. 15, 2003) as follows:

> The law of the case doctrine "generally prohibits reconsideration of issues which have been decided in a prior appeal in the same case, provided that there has been no material changes in the facts since the prior appeal, such issues may not be relitigated in the trial court or re-examined in a second appeal." 5 Am.Jur.2d *Appellate Review* § 605 at 300 (1995) (footnotes omitted). "[T]he doctrine is a salutary rule of policy and practice, grounded in important considerations related to stability in the decision making process, predictability of results, proper working relationships between trial and appellate courts, and judicial economy." *United States v. Rivera–Martinez,* 931 F.2d 148, 151 (1st Cir.1991).

Thus, Ms. Hager could not relitigate that issue because it was specifically settled and affirmed by this Court's denial of the initial petition for appeal on March 23, 2000.

### B. Ms. Hager Sought Only Joint Custody of the Child

Additionally, the majority opinion awarded Ms. Hager *sole* custody of the child when Ms. Hager *did not file a petition seeking sole custody of the child.* The circuit court's order expressly stated that Ms. Hager "filed a *Petition For Modification of Child Custody* in which she cited the passage of Senate Bill 2003 . . ., which [Ms. Hager] contended entitled her to joint physical custody of the parties' child."

Under this new law, which was passed in 1999, a parent may seek to modify a parenting plan without showing changed circumstances.[1] As a result of this new law, Ms. Hager sought to have joint custody of the child without showing a change in circumstances. The majority opinion turned Ms. Hager's relief into a request for sole custody. Moreover, as previously indicated, the majority has awarded Ms. Hager sole custody based upon the relitigation of facts that could not be relitigated.

### C. The Best Interest of the Child Is No Longer the Pole Star in West Virginia.

Lastly, this Court has traditionally held that "[t]he pole star in child custody cases is the welfare of the child." *David M. v. Margaret M.,* 182 W.Va. 57, 60, 385 S.E.2d 912, 916 (1989). *Accord* Syl. pt. 5, *Carter v. Carter,* 196 W.Va. 239, 470 S.E.2d 193 (1996) ("In visitation as well as custody matters, we have traditionally held paramount the best interests of the child."). Indeed, "all parental rights in child custody matters are subordinate to the interests of the innocent child." *David M.,* 182 W.Va. at 60, 385 S.E.2d at 916. That is "[c]ases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)." Syl. pt. 7, *In re Brian D.,* 194 W.Va. 623, 461 S.E.2d 129 (1995). Until the decision in the instant case, "[t]his Court ha[d] not deviated from that principle, and it ha[d] become the ultimate benchmark by which all custody decisions are appraised." *In re Frances J.A.S.,* 213 W.Va. 636, 643, 584 S.E.2d 492, 499 (2003).

From May 1998 until the issuance of the mandate in this case, the child has lived in West Virginia with her father and grandparents. The majority opinion, without any justification, has ripped this child from the stability of her life in West Virginia and ordered her to be removed to Florida to start a new

---

1. Senate Bill 2003 was modified in 2001. The laws which relate to modifying a parental plan are codified at W. Va.Code §§ 48–9–401 to 48–9–403.

life. This decision is not in the best interests of the child. It is in Ms. Hager's best interest.

During the proceedings underlying the case *sub judice,* the lower courts have made the following findings regarding the child's life in West Virginia:

> That the infant child ... in her testimony, testified that she was very happy residing with her father and grandparents, she is happy where she lives and the family is very good to her.

> That [the child] completed kindergarten and first grade in the last two years, has had perfect attendance, has been an exemplary student, and has received numerous awards from the school staff. [The child] was described as a happy child and getting along well.

> ...

> Since the [child was given to her father], [she] has flourished in her educational and social achievement and activities.

> [The father] has been an active, involved, loving, and supportive parent in his attendance, transporting, and participating in educational, social and recreational programs and activities with [the child].

In rendering its decision, however, the majority has clearly ignored this evidence which conclusively demonstrates that the best interests of the child is with her father and in her home in West Virginia. Instead, the majority opinion examined the best interest of Ms. Hager and concluded that she should have the child. By subordinating the child's best interests to that of Ms. Hager, the majority did not merely uproot the child's entire world-the majority has forced this child to live in a home in Florida with a man who was determined by this Court in 2000 to be a clear and present danger to the child.

For the foregoing reasons, I respectfully dissent.