435 S.E.2d 6

PATRICIA ANN S., Plaintiff Below, Appellant,

v.

JAMES DANIEL S., Defendant Below, Appellee.

No. 21474.

Supreme Court of Appeals of West Virginia.

Submitted May 5, 1993.

Decided July 21, 1993.

Dissenting Opinion of Chief Justice Workman July 23, 1993.

---

Mary Ellen Griffith, Princeton, for appellant.

H.L. Kirkpatrick, III, Beckley, for appellee.

PER CURIAM:

This action is before this Court on appeal from the February 14, 1992, order of the Circuit Court of Raleigh County, West Virginia, which granted the parties a divorce upon the grounds of irreconcilable differences. The circuit court awarded custody of the parties' three children, Jason Clark, now fourteen years old; Justin Scott, now eleven years old; and Jennifer Elyse, now seven years old, to the appellee, James Daniel S.[1] On appeal, the appellant, Patricia Ann S., asks that this Court reverse the decision of the circuit court insofar as that she be granted custody of the children. This Court has before it the petition for appeal, all matters of record, and the briefs of counsel. For the reasons stated below, the judgment of the circuit court is affirmed, in part, and this case is remanded, with directions.

I

The parties were married on February 4, 1967, in Beckley, Raleigh County, West Virginia. Three children were born of the marriage. The appellant was a kindergarten school teacher but left her employment upon

---

**1.** We follow our traditional practice in cases involving sensitive facts and use initials to identify the parties rather than their full names. *See In re Scottie D.,* 185 W.Va. 191, 406 S.E.2d 214 (1991).

the birth of their first child. The appellee is an architect.

The appellant instituted this civil action by filing a complaint on July 25, 1990. A temporary order was entered on November 28, 1990. The appellee was granted temporary custody of the parties' two sons, and the appellant was granted temporary custody of the parties' daughter. The parties appeared before the family law master on numerous occasions. On January 10, 1992, the family law master submitted his recommended decision to the circuit court. Among other things, the family law master recommended that the appellee be awarded custody of the three children. Both of the parties submitted their exceptions to the circuit court regarding the family law master's recommendations.

On February 14, 1992, the circuit court judge affirmed the findings of fact and conclusions of law as recommended by the family law master.

On March 18, 1992, the circuit court judge granted the appellant's motion to stay the execution of the final order, and custody of Jennifer remained with the appellant for an additional ninety days. Following the expiration of the ninety-day period, the appellant moved to extend the appeal period and she renewed her motion to stay the execution of the final order. On July 16, 1992, the appellant was granted a thirty-day extension in which to file an appeal with this Court. Her request for an extension or continuance of the order staying the execution of the final order was denied. Since July 16, 1992, to the present, the appellee has had custody of Jennifer.

It is from the February 14, 1992, order of the circuit court that the appellant appeals to this Court.

## II

The primary issue in this case is the appellant's contention that she should be awarded custody of the parties' children. In support of the appellant's contention, she cites three points of error committed by the circuit court

in granting custody to the appellee: (1) the circuit court erred in failing to find that the appellant was the primary caretaker; (2) the circuit court erred in utilizing psychological experts prior to the circuit court's determination as to who was entitled to the status of primary caretaker;[2] and, (3) the circuit court erred in granting custody of the children to the appellee.

The appellant's first argument is that the circuit court erred in failing to find the appellant was the primary caretaker of the three children. The circuit court found that both parties were fit parents and they shared the child care duties; thus, neither party was granted the status of primary caretaker.

■ The parties agree that the guidelines for establishing custody are clearly set forth in *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981). We defined primary caretaker, in syllabus point 3 of *Garska*, as "that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child." The law presumes that it is in the best interests of young children to be placed in the custody of the primary caretaker. *Id.* at syl. pt. 2.

■ It is the circuit court's responsibility to determine which parent is the primary caretaker. *Id.* at syl. pt. 4. In *Garska*, we listed the factors to be considered by the circuit court in making this determination. However, in syllabus point 5 of *Garska*, we pointed out, "[i]f the trial court is unable to establish that one parent has clearly taken primary responsibility for the caring and nurturing duties of a child neither party shall have the benefit of the primary caretaker presumption."

■ It is clear from the evidence that the parties shared the primary caretaker duties as discussed in *Garska*. While the evidence presented established the fact that the appellant was the homemaker and the

**2.** We note that the parties challenged only the final ruling of the recommended order of the

family law master and not the sufficiency of that order.

appellee was the wage earner, this Court has recognized that the length of time a parent has alone with a child is not determinative of whether the primary caretaker presumption should attach. *See Dempsey v. Dempsey,* 172 W.Va. 419, 306 S.E.2d 230 (1983). The appellant was at home for the children when they would return from school while the appellee would work throughout the day. However, the appellee was also a substantial participant in the child care duties once he came home from work.

With respect to the child care duties, the appellant testified that she was a night person, meaning she would stay up late at night and sleep later in the morning. As a result, both parties testified that the appellee would be responsible for getting the boys ready for school and fixing their breakfast. Both parties further testified that the appellant would primarily plan and prepare the evening meals on the weekdays, but on the weekends the appellee would often prepare the evening meals. The parties also testified that they shared the responsibility for getting the children ready for bed each night.

In terms of school and social activities for the children, the evidence is indicative of the fact that both parties were active in their childrens' social lives. The appellant; Natalie Blankenship Coots, Jason's sixth grade teacher; and Joyce Mills, Jason's and Justin's second grade teacher, testified that the appellant participated in PTO (Parent Teacher Organization) meetings and school activities. Mrs. Mills also testified that the appellee was involved with the childrens' school activities; and, the appellee testified that he was instrumental in helping the children with their homework in the evenings.

Furthermore, each parent organized and participated in social activities with the children. The appellant; Mrs. Peggy Giompalo, whose mother lived in the same neighborhood as the appellant and appellee; and Mrs. Anita Allen, the appellant's cousin, testified that the appellant would organize birthday parties for the children, and she would often host pool parties for the children and their

friends at the parties' home. On the other hand, the appellee would arrange and participate in camping, hiking and biking trips as well as other sporting events with the children as attested to by the appellee; the appellant; Nancy Jo S., the appellee's sister-in-law; and Reese and Ron Webb, Jr., the appellee's sister and brother-in-law.

Finally, the evidence suggests that the parties shared in the responsibility of disciplining the children. The appellee admitted that he used a belt to whip the boys, but he stated that he used his hand to whip Jennifer. The appellant, however, stated that she no longer uses the belt to whip the children. Rather, the appellant testified that she had attended parenting classes, and as a result, she employed a new method of discipline such as taking away the childrens' privileges and grounding them for their wrongdoings.

■ The circuit court found, and we agree after reviewing the record and the relevant testimony, that neither party is entitled to the status of primary caretaker because the child care duties were shared equally by the parties. Therefore, the issue of custody properly rests on the best interests of the child. *See, e.g., Dempsey,* 172 W.Va. at 420, 306 S.E.2d at 231 ("In view of the fact that the primary caretaker presumption was inapplicable, the trial judge turned to a determination of which parent was better suited to have custody of [the child]. The best interests of the child must be the court's guide in this determination.") *See also Loudermilk v. Loudermilk,* 183 W.Va. 616, 618, 397 S.E.2d 905, 907 (1990); *T.C.B. v. H.A.B.,* 173 W.Va. 410, 412, 317 S.E.2d 174, 176 (1984); and *W.Va.Code,* 48–2–15 [1992].

With this in mind, we turn to the appellant's second argument. The appellant contends that the circuit court erred in utilizing psychological expert witnesses prior to the circuit court's determination as to who was entitled to the status of primary caretaker.

At the hearing regarding temporary custody, on September 25, 1990, the appellee

called psychologist, Mari Sullivan Walker, to testify before the family law master. Ms. Walker met with the appellee and the three children for approximately ninety minutes on September 22, 1990. Ms. Walker was of the opinion that the children perceive their father as the more nurturing person rather than their mother. Ms. Walker testified that all three children told her that the appellant "beat" them. Ms. Walker further stated that rather than asking the children which parent they preferred to live with, she asked them how they thought life would be with their father versus life with their mother. Based upon the childrens' responses, Ms. Walker opined that the children have more faith in their father as opposed to their mother whom they were afraid of and with whom they were angry. Ms. Walker recommended that the appellee be granted temporary custody of the children, however, she admitted that she could not make any recommendations regarding permanent custody based upon a ninety-minute interview.[3]

The temporary hearing was continued on November 6, 1990. On that day, Dr. Charles Yeargan, a child psychologist, testified before the family law master. Dr. Yeargan was initially hired by the appellant, but later the parties agreed to use him as a neutral expert to give his opinion regarding the welfare of the children. In October of 1990, Dr. Yeargan interviewed the entire S. family.

In response to questions asked by appellee's counsel, Dr. Yeargan stated that he didn't ask the children where and with whom they wanted to live; however, based upon the childrens' comments, it was Dr. Yeargan's opinion that the children feel emotionally safer with the appellee. Therefore, Dr. Yeargan opined that he believed the children would prefer to live with the appellee.

Dr. Yeargan stated that the children perceive the appellee as emotional and supportive, and the appellant is perceived as angry. Further, Dr. Yeargan testified that Jennifer told him that if her brothers live with the appellee, then that is where she wants to live. Dr. Yeargan also opined that both parents have behavioral traits that they need to work out in order for them to be able to better cope with and relate to their children.

Ultimately, it was Dr. Yeargan's opinion that it was in the best interests of the two boys, Jason and Justin, that they live with the appellee. With respect to Jennifer, Dr. Yeargan admitted he did not have a lot to go on, but he recommended that Jennifer live with her mother because of "the interests of the two different parties," "the activity levels," "the socialization issues" and "the involvements."

At the final custody hearings on August 6 and 7, 1991, the appellee was permitted to introduce the testimony of another psychologist, Dr. Carl McGraw. In June of 1990, Dr. McGraw interviewed all three children, the appellee, and the appellee's mother, because she had been helping care for the children. Dr. McGraw stressed the importance of keeping the children together in order to keep the family unit intact. Dr. McGraw noted that he had difficulty understanding Dr. Yeargan's reasoning for splitting the children between each parent. Dr. McGraw testified that the children told him they felt their mother was mean. Dr. McGraw stated he didn't ask the children who they wanted to live with, but he testified that they were adamant about wanting to live with their father. It was Dr. McGraw's opinion that the children would "have a better chance" if all three of them were to live with the appel-

---

3. We note that Ms. Walker was found to be in non-intentional technical violation of the Ethical Principles of Psychologists by the West Virginia Psychological Association, Inc., Peer Review for Ethics Committee (hereinafter "Committee"). More specifically, the appellant charged Ms. Walker with making the recommendation that the appellee receive temporary custody of the children on the basis of a single ninety-minute interview, with the children and the appellee, without seeking her input or consent. The Committee found that Ms. Walker surpassed the limits of her data when making the temporary custody recommendation.

lee, considering the rapport the appellee has with the children.[4]

▪ The appellant argues that the family law master failed to follow the rule enunciated by this Court in *David M. v. Margaret M.*, 182 W.Va. 57, 68, 385 S.E.2d 912, 924 (1989): "In West Virginia we intend that generally the question of which parent, if either, is the primary caretaker of minor children in a divorce proceeding is to be proven with lay testimony from the parties themselves and from teachers, relatives and neighbors." We do not believe the family law master or the circuit court judge deviated from the above-mentioned guideline.

It is true that this Court expressed antipathy towards over-reliance on such experts, by stating in *David M.*, 182 W.Va. at 63, 385 S.E.2d at 918–19, that:

Under the individualized approach to the 'best interests of the child' standard, custody, when contested, goes to the parent who the court believes will do a better job of child rearing.... In order to assign custody, the court must explore the dark recesses of psychological theory to determine which parent will, in the long run, do a better job.

However, this undertaking inevitably leads to the hiring of expert witnesses— psychologists, psychiatrists, social workers and sociologists. These experts are paid by the parties to demonstrate that one or the other (coincidentally, always the client) is the superior parent in light of his or her personality, experience and aptitude for parenting. The experts will advance the theory that whatever positive aspects of personality their client possesses are pre-eminently important to successful single-parent child-raising.

However, within the record, there is no evidence to suggest that the family law master or the circuit court judge over-utilized the psychologists' reports and testimony in making the primary caretaker determination. The parties and numerous other witnesses testified regarding who was primarily re-sponsible for the child care duties, as compared to the psychologists who barely touched upon the issue. The record indicates that the circuit court relied upon the expert witness' testimony, specifically, Dr. Yeargan's, in determining which party shall be awarded custody, as per *David M., supra.*

The appellant's third argument is that the circuit court erred in granting custody of the parties' three children to the appellee.

▪ In syllabus point 1 of *Loudermilk, supra,* this Court held:

When a trial court finds that: (1) there is no primary caretaker parent before divorce; (2) both parents are fit parents; and, (3) both parents live geographically close to one another, it is not error to award legal custody to one parent but to allow visitation to the other parent during each alternate week of the year.

The circuit court did find that both parties were fit parents, but the circuit court did not designate a primary caretaker. It was also clear from the record that the parties would continue to live in the same town. Moreover, the circuit court awarded the appellant the right of reasonable visitation with the children on alternate weekends.

The circuit court determined that the best interests of the children would be served by awarding custody to the appellee. There was an abundance of evidence presented in this case, which included the testimony of the parties, neighbors, teachers, family members, friends and psychologists. As we have already set forth the psychologists' testimony, the lay witness' testimony regarding this issue is as follows.

Jessica Halstead Sharp, a neighbor and friend of the parties, testified that she found the appellee to be loving and nurturing towards the children unlike the appellant who,

---

4. Dr. McGraw's testimony was called into question by the appellant pursuant to her petition for review of the family law master's recommended decision before the circuit court. The appellant alleged that her daughter revealed to her that on the trip to Dr. McGraw's office, her brother, Jason, told her what to say to the psychologist.

in Mrs. Sharp's opinion, had a problem dealing with the children. Mrs. Sharp also stated that, on more than one occasion, she overheard the appellant calling the children vulgar names.

In addition, Nancy Jo S. and Reese and Ron Webb, Jr. testified that the children interact well with the appellee. However, they all felt the appellant acted hostile with the children, and thus, the children did not respond well to her. All three witnesses further confirmed Mrs. Sharp's testimony that the appellant called the children vulgar names, and they added, she used bad language around the children as well.

In custody disputes, it is often a power struggle between the parties to see who can provide the most evidence in support of his or her position. It becomes a bitter battle and eventually comes down to one party's word against the other. The wants and needs of the parties are secondary to this Court's paramount concern, which is the best interests of the children. The evidence before us suggests that the children feel emotionally safer and more stable with their father. Accordingly, the circuit court judge, in response to the appellant's petition for review of the family law master's recommended order, relied upon Dr. Yeargan's testimony in formulating his decision with regard to custody and noted in his summary ruling:

> Dr. Yeargan, when asked for his opinion as to placement, referred again to the fact that the children while with the mother would experience a 'sense of being out of control,' and the 'sense of feeling vulnerable in the management move, calmness in the organization of the home,' and suggested that they be with their father. Having said that, Dr. Yeargan went on to state that Jennifer may 'in the long run' be better off living with her mother. The reasons given to support this conclusion as to Jennifer consisted of vague references to 'the interests of the two different parties, the activity levels, the involvements, the things that are going on, and some of the socialization issues, a little girl with her mom[.]'

While Dr. Yeargan could express concrete, coherent reasons why all three children should be with their father, he resorted to vague generalities to explain why Jennifer should be separated from her brothers and from her father with whom she felt emotionally safer, and committed to the custody of her mother. The Master was justified in concluding that this was not a sufficient reason to award custody to the Plaintiff/Petitioner.

 Jason, the eldest son at fourteen years of age, is old enough to make a decision as to which parent he wants to live with, and the record clearly supports the circuit court's finding that Jason should live with his father. *See Garska, supra;* *W.Va.Code,* 44–10–4 [1923]. Justin, on the other hand, is eleven years of age and not quite capable of making such a decision, but the evidence supports the circuit court's finding that he should live with his father. In addition, the appellant admits that there is a lot of hostility between the boys and her, and because of this anger she might not be able to manage them.

 This Court has consistently recognized, as stated in syllabus point 8 of *Wyant v. Wyant,* 184 W.Va. 434, 400 S.E.2d 869 (1990) that:

> ' "Questions relating to alimony and to the maintenance and custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syllabus, *Nichols v. Nichols,* 160 W.Va. 514, 236 S.E.2d 36 (1977).' Syllabus, *Luff v. Luff,* 174 W.Va. 734, 329 S.E.2d 100 (1985).

We, therefore, are of the opinion that the circuit court did not abuse its discretion by awarding custody of the two boys to the appellee.

 However, with respect to Jennifer, we do not believe that the record has been adequately developed. A close reading of the record offers minimal insight into her thoughts and behavior. The record further indicates that Dr. Yeargan prefaced his opin-

ion regarding custody by stating he did not "have a whole lot to go on" regarding Jennifer. The circuit court judge also recognized the lack of focus on Jennifer when he stated, in his summary ruling above, that Dr. Yeargan "resorted to vague generalities" to explain why Jennifer should live with her mother.

The boys have been in the custody of their father since November 28, 1990, the date the temporary custody order was entered. The appellant was granted temporary custody of Jennifer. By order dated March 18, 1992, the circuit court judge granted the appellant's motion to stay the execution of the final order; and thus, Jennifer was permitted to remain in the custody of the appellant for an additional ninety days. Following the ninety-day period, the appellant renewed her motion to stay the execution of the final order but such motion was denied. Since July 16, 1992, the date of the order denying appellant's motion to stay the execution of the final order, Jennifer has been in the custody of her father. We are unaware of the reason why counsel for the appellant did not request this Court to stay the execution of the final order when counsel presented the petition for appeal. As a result, Jennifer has been with her brothers and in the custody of the appellee for a little more than a year.

Jennifer is still very young. As noted by Dr. Yeargan, Jennifer is the least "scathed" or the least harmed of the three children from this battle between her parents.

■ This Court has recognized when the record is unclear and factual development would aid in reaching the correct legal decision, a remand is warranted:

'When the record in an action or suit is such that an appellate court can not in justice determine the judgment that should be finally rendered, the case should be remanded to the trial court for further development.' Point 2, Syllabus, *South Side Lumber Co. v. Stone Construction Co.*, 151 W.Va. 439 [152 S.E.2d 721].

Syllabus, *Painter Motors, Inc. v. Higgins*, 155 W.Va. 582, 185 S.E.2d 502 (1971). *See also Allen v. Allen*, 173 W.Va. 740, 320 S.E.2d 112 (1984); 27C C.J.S. *Divorce* § 754 (1986).

Based upon the foregoing, we remand this case to the circuit court for additional testimony in order to further develop the record to determine what is in the best interests of Jennifer. The appellee shall continue to have custody of Jennifer pending the outcome of the proceedings below.

The record is replete with evidence that the parenting skills of both parents are lacking. Further evidence suggests that the appellee has been using and manipulating the children against the appellant, and this controlling behavior by appellee has had an adverse impact on the appellant's relationship with her children, especially the two boys.

■ The majority of the witnesses who testified in this case noticed the destructive effects on the children due to the absence of good parenting skills. Dr. Yeargan, in his testimony before the family law master, even made recommendations as to how each party could improve upon such skills. Based upon all the evidence, we think the circuit court judge should have identified the need of the parties to obtain parental counseling. We note that the appellant, as suggested by the evidence, appears to be more receptive to counseling, unlike the appellee, who was more unwilling to participate.

We are of the opinion that it is important that the appellee, as well as the appellant, seek parental counseling. Therefore, the circuit court judge should recognize the importance of counseling on remand when determining what is in Jennifer's best interest. Clearly, counseling for the parties would materially promote the welfare of the children.

This is a very difficult case. As a result of the parties' divorce, perhaps the children can be separated, in some degree, from the hurt and anger that have become so prevalent in their lives. The children may then form the

important bonds of parent and child without undue interference from the parents.

Thus, after a thorough review of the record and arguments of counsel, we hold that the circuit court judge did not abuse his discretion by concluding that the best interests of the two boys would be served by awarding custody to the appellee. With respect to Jennifer, we remand the case to the circuit court for further development of the record in order to determine what is in her best interests; and, as previously mentioned, she shall remain in the custody of the appellee pending the outcome of the proceedings below. Because of the passage of time, upon remand, the circuit court should ensure that this matter receives an expedited hearing to resolve the issues raised in this opinion.

For the foregoing reasons, the judgment of the Circuit Court of Raleigh County is affirmed, in part, and this case is remanded, with directions to further develop the record.

Affirmed, in part; remanded, with directions.

WORKMAN, Chief Justice, dissenting:

The majority opinion marks a sharp departure from the primary caretaker rule which has been a viable and working concept in West Virginia for more than a decade. More disturbing, however, is the determination that it is in the best interests of children to place them in the custody of a parent who has abused both the wife and the children. In doing so, the majority implicitly places its stamp of approval on physical and emotional spousal abuse.

Deaths by domestic violence are increasing dramatically every year in West Virginia, and there is much discussion about the inefficacy of the judicial system in dealing with family violence. But until judicial officers on every level come to a better understanding of the phenomenon of family violence in its finer gradations, the response of the court system will continue to fall short. The majority demonstrates a tragic lack of understanding of the true nature of the dynamics that underlie family violence.

*Erosion of Primary Caretaker Concept*

The primary caretaker rule as set forth in *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357 (1981), has been an important part of domestic relations law in child custody disputes for more than twelve years. In actuality, the concept dates back further to our case of *J.B. v. A.B.,* 161 W.Va. 332, 242 S.E.2d 248 (1978), wherein this Court "established a strong maternal presumption with regard to children of tender years." *Garska,* 167 W.Va. at 60–61, 278 S.E.2d at 358. This Court abolished the gender-based presumption in *Garska,* imposing in its place the gender-neutral primary caretaker rule. *See id.* at 70, 278 S.E.2d at 363. We explained the development of the primary caretaker rule in *Garska* at length:

> In setting the child custody law in domestic relations cases we are concerned with three practical considerations. First, we are concerned to prevent the issue of custody from being used in an abusive way as a coercive weapon to affect the level of support payments and the outcome of other issues in the underlying divorce proceeding. Where a custody fight emanates from this reprehensible motive the children inevitably become pawns to be sacrificed in what ultimately becomes a very cynical game. Second, in the average divorce proceeding intelligent determination of relative degrees of fitness requires a precision of measurement which is not possible given the tools available to judges.... Third, there is an urgent need in contemporary divorce law for a legal structure upon which a divorcing couple may rely in reaching a settlement.

167 W.Va. at 66–67, 278 S.E.2d at 361–62. After stating the rationale for implementing the primary caretaker rule, this Court ruled that: "in any custody dispute involving children of tender years it is incumbent upon the circuit court to determine as a threshold question which parent was the primary caretaker parent before the domestic strife giving

rise to the proceeding began." *Id.* at 68–69, 278 S.E.2d at 363.

In the instant case, it was clearly an abuse of discretion for the family law master and the circuit court to deny primary caretaker status to the mother. It is unfathomable that a woman who gives up her career (in this case, that of being a kindergarten teacher) to stay home to raise three children does not qualify as the primary caretaker, when as a full-time stay-at-home mother she breastfed all three children; was so concerned about unnecessary additives and excess sugar that she processed her own baby food; was responsible for the majority of meal planning and preparation; was primarily responsible for laundering the family's clothing and housecleaning; was a Girl Scout troop leader; was a regular volunteer at her children's school and an active member of the parent-teacher organization; was responsible for scheduling and taking the children to their medical appointments; and was primarily responsible for managing the children's social activities.[1] For some unarticulated reason, both the family law master and the circuit court appear to have been bowled over by the fact that the father helped in the evenings and weekends. Not unlike many modern fathers, the Appellee did participate in some of the household and childrearing responsibilities. The mother and father jointly oversaw the bedtime routine of the children. Upon the birth of the third child, the father, by agreement of the parties, awoke the two oldest children and prepared their breakfasts, because the baby (Jennifer) was up a lot at night. As Jennifer grew older and began sleeping all night, the parties continued this routine. Although the mother stayed up late, during those evening hours she cleaned up from dinner, prepared lunches for the children to take to school the next day, and did other household duties. The Appellee planned recreational activities such as camping and hiking trips, primarily for the boys. Given the father's admitted ten to twelve-hour work days combined with frequent business trips which took him away from home, it is difficult to conceive how he could ever qualify as having equal caretaking responsibility. The family law master and circuit court's conclusions that neither individual qualified as the primary caretaker has the effect of somehow elevating the father's necessarily limited hours with the children, given his lengthy work days, to accord him the same caretaker status as the full-time stay-at-home mother. The majority in essence places a higher value on a father's time and contribution.[2]

By upholding the circuit court's ruling, the majority begins an erosion of the primary caretaker rule,[3] or at least sends a signal to domestic relations practitioners that it will be situationally ignored when expedient. While this Court did acknowledge in *Garska* that there will be cases where neither parent has clearly taken primary responsibility for nurturing and rearing the children, this clearly is not such a case. *See* Syl. pt. 5, *Garska,* 167 W.Va. at 59, 278 S.E.2d at 358. What has happened in this case is precisely what this Court was concerned with in *David M. v.*

---

1. This woman fits the profile of what at least one member of the Court (Justice Neely) has said mothers should be. Furthermore, a full exploration of the evidence reflects that one of the major complaints about this woman is that she uses bad language, a quality that Justice Neely surely can't hold against her.

2. The majority cites *Dempsey v. Dempsey,* 172 W.Va. 419, 306 S.E.2d 230 (1983), for the proposition that the length of time a parent is "alone with the child" is not dispositive. *Dempsey* did not involve the length of time a parent was alone with the child. It was a case wherein the mother was the sole caretaker from 1978–1980 and the appellee was the sole caretaker from 1980 until the time of the divorce. This Court held that even though the appellant had assumed the caretaking duties for a longer time, that "length of time alone (in which each party has sole responsibility) is not determinative of whether the presumption should attach." *Id.* at 420, 306 S.E.2d at 231. It spoke not at all in terms of "length of time alone with the child," as the majority implies.

3. When the Appellee presented the first expert witness on the fitness/best interests issue, the family law master, in response to Appellant's objection, even acknowledged that it was a deviation from the primary caretaker rule, but in essence said the rule was being eroded "and we should feel free to deviate from that if there is some real good reason for that."

*Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989), when we ruled in syllabus point four, in part, that: "[i]n West Virginia we intend that generally the question of which parent, if either, is the primary caretaker of minor children in a divorce proceeding is proven with lay testimony from the parties themselves and from teachers, relatives and neighbors." *Id.* at 68, 385 S.E.2d at 913. Whereas the majority "do[es] not believe the family law master or the circuit court judge deviated from the above-mentioned guideline[,]" the circuit court in a "Summary Of Ruling" on the issue of Appellant's petition for review of the family law master's recommended decision explicitly acknowledges that "[t]he surface appearance is that this is a matter of competing experts." Sadly, that is exactly what this case boils down to—one expert[4] versus another, rather than a decision based on lay testimony. We explained the dangers of relying on expert testimony in custody cases in *David M.,*

> Expert witnesses are, after all, very much like lawyers: They are paid to take a set of facts from which different inferences may be drawn and to characterize those facts so that a particular conclusion follows. There are indeed cases in which a mother or father may appear competent on the surface, only to be exposed after perfunctory inquiry as a child abuser.... The side with the stronger case can afford to hire only competent experts with profound integrity; the side with the weaker case, on the other hand, wants impressively glib experts who are utterly devoid of principles. When both parents are good parents, the battle of the experts can result only in gibberish.

182 W.Va. at 63–64, 385 S.E.2d at 919.

In this case, the testimony of three expert witnesses was admitted. Only one of the three, Dr. Charles Yeargan, was deemed by the court to be an independent expert. The Appellee sought out Dr. Mari Walker, who

has since been disciplined by the West Virginia Psychological Association for violation of the ethical principles of the American Psychological Association for her testimony in this case. Without ever meeting with the Appellant (and only briefly meeting with Appellee and the children), Dr. Walker gave an opinion that custody of all three children should be awarded to their father. Later, the Appellee sought out another expert, Dr. Carl McGraw, who concurred with the findings of Dr. Walker that custody should be placed with the father. Of primary interest to Dr. McGraw was his concern that the children not be split up among the parents. While this is certainly a laudable concern, it appears that this focus may have totally overshadowed Dr. McGraw's "objectivity" with regard to his ultimate recommendation.

The upshot of this case is that first, the family law master, and ultimately, the circuit court, bypassed the "threshold question" of primary caretaker and were sidetracked by testimony concerning the relative fitness of the parties. *Garska,* 167 W.Va. at 69, 278 S.E.2d at 363. Only after the primary caretaker issue has been resolved does the question of fitness become relevant. *See* syl. pt. 4, *David M.,* 182 W.Va. at 58, 385 S.E.2d at 913. In this case, both the trier of fact and the circuit judge "avoided" the primary caretaker issue by prematurely infusing the issue with questions of relative fitness and relying on "experts."

The family law master and circuit court also erred by permitting testimony on the issue of the *relative* fitness of the parties. Fitness, once it has properly been raised, does not involve a comparison of the parties, but instead requires a showing that the individual designated as the primary caretaker is unfit. As we stated in syllabus point four of *David M.,* in part,

> Once the primary caretaker has been identified, the only question is whether that parent is a 'fit parent.' In this regard, the court is not concerned with assessing rela-

---

4. The "expertise" of the Appellee's experts is also questionable, which will be explored later in this

opinion.

tive degrees of fitness between the two parents such as might require expert witnesses, but only with whether the primary caretaker achieves a passing grade on an objective test.

*Id.* at 58, 385 S.E.2d at 913. Because there was no showing of unfitness on the part of the mother, who clearly qualified as the primary caretaker, the majority opinion does great disservice to the primary caretaker rule in addition to exacerbating the pain of this family.

The lower tribunals then embarked on a best interests analysis, and it is in this arena that the family law master and circuit court demonstrated the most overwhelming lack of insight into the dynamics of this family and indeed the dynamics of domestic violence.

### Majority Okays Spousal Abuse

This father not only takes a belt to the three children[5] regularly, but he also has taken a belt to his wife. Phenomenally, the family law master did not permit the wife to testify in detail to the physical abuse she endured throughout the marriage, as he apparently concluded it had nothing to do with the children.

In fact, spousal abuse has a tremendous impact on children.

Children learn several lessons in witnessing the abuse of one of their parents. First, they learn that such behavior appears to be approved by their most important role models and that the violence toward a loved one is acceptable. Children also fail to grasp the full range of negative consequences for the violent behavior and observe, instead, the short term reinforcements, namely compliance by the victim. Thus, they learn the use of coercive power and violence as a way to influence loved ones without being exposed to other more constructive alternatives.

In addition to the effect of the destructive modeling, children who grow up in violent homes experience damaging psychological effects. There is substantial documentation that the spouse abuser's violence causes a variety of psychological problems for children. Children raised in a home in which spouse abuse occurs experience the same fear as do battered children. . . .

. . . .

. . . .

Spouse abuse results not only in direct physical and psychological injuries to the children, but, of greatest long-term importance, it breeds a culture of violence in future generations. Up to 80 percent of men who abuse their wives witnessed or experienced abuse in their family of origin. Abused children are at great risk of becoming abusive parents.

Thus, the ultimate question in assessing the relative fitness for custody of the abuser and victim is which parent is most likely to provide the children with a healthy, caring and *nonviolent* home.

L. Crites & D. Coker, *What Therapists See That Judges May Miss,* The Judges' Journal, 9, 11–12, (Spring 1988) (footnotes omitted) (emphasis in original).

There is yet another aspect of spousal abuse that judges and many others find difficult to understand. These relationships are characterized not only by physical abuse, but also by repeated humiliation and other psychological abuse that " 'reaches the level of a campaign to reduce the partner's sense of self-worth and to maintain control[;]' " and "a pattern on the part of the abusive partner to control the victim's daily actions . . . ." Crites & Coker, *supra,* at 9.[6]

---

5. According to the mother's testimony, the father also regularly disciplined Jason (the oldest boy) by grabbing his shoulders and pushing him up against a wall or tree, on one occasion bruising his head. The father admitted overreacting and perhaps using excessive force, but denied it happened on a regular basis. The mother admitted that she, at one time, also used corporal punishment on the children, but had taken parenting classes in 1989 and learned that there were better ways to handle discipline. She testified that she used time-outs and withdrawal of privileges following her completion of the parenting classes.

6. An abused woman may be defined as one who is repeatedly subjected to any forceful physical or

It is clear from Mr. S.'s testimony that he ran this family with an iron hand, a significant trait in abusive relationships being the total power and control of one party. The evidence reflects that for some period of time Mrs. S. was not allowed to have a cent, not even grocery money. She was permitted to write a grocery list, and if her husband was ever-so-gracious, he would include her requests. Once she attempted to take $20 from his wallet and wound up in the emergency room after he wrestled with her over it. Mr. S. testified that he actually found the whole episode rather humorous, likening his wife clinging desperately to the $20 bill by hiding it in her mouth as resembling a lizard with lettuce sticking out of its mouth.

One of the complaints made about this mother is that she lacked the ability to manage the boys, ages twelve and ten at the time of the hearings, and surely the record is clear that it was difficult for her to manage these boys, especially Jason, the older of the two. In her petition for review, she pointed out that for several years, her husband had been "mentally, emotionally, and physically cruel" to her.[7] Studies demonstrate that after ages five or six, children show strong indications of identifying with the aggressor and losing respect for the mother. *See* Crites & Coker, *supra,* at 11.

In her personal petition for review to the circuit court, she stated

My two boys in particular identify with their father. Unfortunately, their father has downgraded me for years in front of them and continues to do so. I would become angry in response. The children have seen their father hit me with a belt. My oldest son Jason has bit me and kicked me so hard to have left bruises on me. Jason repeats to me in arguments what his father tells him happens in court. Jason has attacked my mother and caused my

father to get a lump on his head by slamming an attic door on his grandfather. Jason is the thirteen year old who has the added problems of puberty on top of this divorce. My second son Justin is ten years old and is having difficulty adjusting. Since he has been with his father, his grades have gone from "A's" and "B's" to some "C's", "D's", and one "F". My six year old daughter, Jennifer is a 4.0 student in first grade. She is also in the gifted program. She has done fine under my care alone this past year.

The evidence reflects that Mr. S. modelled for these children the behavior of demeaning, discrediting, and otherwise disempowering the mother. For example, the father devised a point system to reward good behavior and punish bad behavior. When the mother attempted to participate in the system as a method of encouraging good behavior and managing the children, the children were told that "mommy's points don't count" and "mommy is crazy." The mother testified that the children's response was that "you're not the boss, daddy's the boss...." Furthermore, the father would tally the points and take the children to the toy store for the payoff, which the mother had no financial resources to do.

From Dr. Yeargan's report:

Mr. S. reported that he can't see himself trying to tell the boys to be kinder and gentler to their mother for fear that he'll lose credibility with them. He said, "I'm not too interested in finding a way to help the enemy camp look good or better.... until all three kids are together and this is resolved. My primary objective is to have the three kids."

Mrs. S. testified that she attended counselling, both in an effort to save the marriage and in an effort to get help in working with

*psychological* behavior in order to coerce her to do something without any concern for her rights. *See* I. Bessenyey, *Visitation in Domestic Violence Context: Problems and Recommendations,* 14 Vt. L.Rev. 57 (1989).

7. As noted earlier, the family law master interrupted her testimony on physical abuse to assure the parties that he always entered a "boiler plate" restraining order on both parties and essentially indicated he wished to hear no more on this issue.

the children, and that she read a number of books on parenting and divorce. She admitted that she used bad language (as did the whole family) and that the husband's constant demeaning of her in front of the children made her angry. She acknowledged she had made mistakes and was working to correct them.

Mr. S., however, presents himself as the perfect father as demonstrated by his testimony that his rapport with the children was "exemplary," and "that it would be very difficult to improve upon." He described himself as "nurturing," "kind," "loving," "caring," "understanding," and "patient."

But a look at Dr. Yeargan's report presents a very different picture of this man:

> some of the same parental behaviors that previously contributed to the children feeling torn between parents is continuing; those behaviors are (a) increasing the alienation between the children and their mother and (b) exacerbating the loneliness which the boys feel for their sister and vice versa. In this examiner's opinion the behaviors of Mr. [S.] . . . . are of primary importance in the creation of more alienation and loneliness in the children.

The same report details the control and manipulation of the children by Mr. S.:

> All three children report pain over being split but the two boys report it in a way that reflects their father's opinion. Jason, for example, reports the opinion that the children should not be separated and says that they shouldn't ". . . because we'll grow up to be total strangers." Justin reports that being ". . . sad over Jennifer" is his biggest concern. He then goes on to say, "That's really the only problem. Dad says to just tough it out and he's working on it. It's wrong to split up the children cause they'd not grow up together and they'd be total strangers." Two weeks after I talked with the boys Mr. [S] . . . reported to me virtually verbatim the same rationale for why the children should not be split. I infer that (a) the children would naturally express their discomfort in existential terms of the things that they are not now enjoying, (b) their expression of concern

for future estrangement indicates how their father is contributing to, not allaying, their fears and (c) the boys, and possibly Jennifer, have been led by their father to hope that he will eventually get the children together under one roof.

> . . . .

All three children report knowledge of complaints which their father has with their mother which should not be told to them. The obvious effect that this knowledge has is to (a) divide their allegiance deeper and (b) alienate them further from their mother. Jennifeer [sic], for example, mentions that her mother does not want to pay the phone bill. Jason reports of his mother, "She'll run up his (father's) credit cards, get new glasses, run up his medical bills, buy vitamins and stuff like that that she doesn't need." When asked how he knew about all of that he replied, "Dad tells us cause there's really nothing he has to hide from us." Justin reports that they "sometimes" still see parents fussing during the times when the parents are picking up or dropping off the children to one another. He goes on to report that his father tells them about various arguments which occur between him and their mother (arguments which occur on the phone, at the office, etc.).

Mr. [S.] . . . . arranged for the boys to see a counselor (Michael Sheridan) after the separation and reported to Mrs. [S.] . . . . that it was because of their relationship to their mother. According to Mrs. [S.] . . . she was excluded by Mr. [S.] . . . . from any information or advice by that counselor. Mr. [S.] . . . . reported to me that Mr. Sheridan had helped the boys to accept that some of the sanctions being imposed by their mother during visitations were a direct result of their behavior (trashing their mother's Christmas decorations, etc.) However, Mr. [S.] . . . did not use that opinion of Mr. Sheridan to support the boys' mother in dealing with the destructive things the boys were doing; he declined to tell her any-

thing about what transpired in Mr. Sheridan's office. Furthermore, in his discussion with me he missed the point that the boys should assume responsibility (i.e. feel some measure of reproach or make amends for misbehaving.) Instead, he assumed that the important lesson that the boys learned from Mr. Sheridan was that "... you can esteem yourselves for coping well with difficulty."

Mr. S. acknowledges that (although less frequently on five-year-old Jennifer), yes, he does use a belt on all three children, and according to unrefuted testimony he also has grabbed Jason by the shoulders and banged Jason's head against a tree. His own description of how he handles physical discipline shows best the kind of fear he uses to exert control over this family:

> Normally, the punishment is a smack on the behind with a belt. And I tell them what will happen if they transgress or exceed certain limitations; and, when they, on occasion—not recently, but on occasion—test an adult's authority, which all children are want (sic) to do, I have no choice but to follow through consistently with what I told them would happen.

> And when I do that, we discuss it, and I make sure they understand the nature of the discipline. We even negotiate sometimes about how many smacks they want. I will frequently ask them how many smacks that they think that the offense is worth, and frequently they will say four, and I had only planned, maybe, to give them one, maybe two at most, and we will discuss the issue.

> Frequently, I will, at the last minute, decide that I can't even spank them anyway, after having gotten them ready to be spanked, decide that I—it's difficult to do, and will let the belt fall aside and smack the bed or the floor and say to them, I'm going to let you go this time, but don't do that again.

> On the occasions when I do smack their behinds with a belt, I will always make sure, after I have done it in a controlled and unemotional way—never in anger—that they understand what the punishment

was for and why I had to do it, and I will always check their little bottoms to make sure that there is not sufficient force to seriously damage them, say bruising or whatever.

With all of these circumstances, one may wonder why the children were taken from the mother. A close reading of the record reveals that the most damaging things that can be said about Mrs. S. are that 1) she uses bad language; 2) she is very angry; 3) the children told the psychologists that they wanted to live with their father; and 4) one of the psychologists concluded that they "feel safer with their father."

### Anger

What judges and indeed many therapists usually fail to understand is the behavior manifestations battered women frequently demonstrate. For example, a battered woman

> may appear in court as unstable, nervous, inarticulate, or angry—a result of her ordeal. The batterer, on the other hand, may appear in command of himself, calm, well spoken and so forth—and may appear in court as the more fit parent. This may operate to the disadvantage of the victim not only in the eyes of the judge, but also with counselors meeting with one or both of the parents and with psychologists hired to do a psychological evaluation.

Crites & Coker, *supra*, at 40.

> It has further been recognized that:

> many women do not present a tearful passive personality to the psychologist.... Anger and a new assertiveness are positive characteristics of the recovering abuse victim. She is angry at being abused, and angry at having been blamed by him and by unaware therapists for having caused it. And she is especially angry at his attempts to take the children away.

Crites & Coker, *supra*, at 41.

Psychologists unfamiliar with all the circumstances and with the unique dynamics of family abuse may make these mistakes:

1. They fail to see that the victim's anger is appropriate and normal.... 2. They look to the victim's behavior and personality problems to explain the abuse.... Such blaming of the victim tends to reinforce the abuser's position that ... the victim is crazy. 3. They seem to identify with the seemingly sociable, 'appropriate' male as a man who has been pushed beyond his limits by an 'angry woman.' 4. They fail to see beneath the sincere, positive image of the abuser, but look instead for the 'typical' abuser personality.... 7. Finally, they criticize [the woman] for focusing her anger on her husband....

Crites & Coker, *supra,* at 42.

It does not appear that any of the psychologists had any information on the domestic abuse and none dealt with the physical abuse; only Dr. Yeargan seems to have had any information on the psychological abuse and domination. If family law masters and judges are to make decisions on the lives of troubled families, they must become sufficiently knowledgeable about physical and emotional domination to enable them to recognize that these factors are just as invidious, and probably more pervasive, than physical abuse alone. And we must begin to see anger on the part of the victim as healthy.

### Children's Preference

The children of David Koresh felt safe with him. While this dissent does not seek to compare Mr. S. with David Koresh, it implores judges to see that family relationships wherein one person has all the power (frequently not only through the purse-strings, but also as a result of both learned and socially-imposed helplessness) are also abusive.

These children learned from their father that their mother did not have even sufficient authority to purchase a package of Oreo cookies for them, that it was okay to demean, disobey, and verbally abuse her, and that physical violence awaited those who did not do as he said. The mother reacted with anger, and the father by word, deed, and dollar delivered the message that mommy's crazy and mommy's contemptible.

Jason was twelve years old at the time of the hearings before the family law master and thirteen by the time of the divorce. Thus, he was only thirteen at the time he last expressed a preference on the record in this case (not fourteen, as the majority indicates). We have said that. a child has a right to nominate his own guardian at age fourteen, and that his preference can be accorded deference even before fourteen, depending on his age and maturity. *See David M.,* 182 W.Va. at 64, 385 S.E.2d at 920. Consequently, even though the mother was the primary caretaker, the circuit court cannot be said to have abused its discretion in giving weight to Jason's preference and placing him in the custody of his father. In all likelihood, and by all the evidence, this young man has already demonstrated a propensity to act out anger with violence, and we can only hope we do not see him in court in another generation.

Justin was ten years old and Jennifer six years old at the time their preferences were expressed. Although it could be argued that a ten-year-old's preference could be given some weight, Jennifer at six was too young to express a meaningful preference. Furthermore, a reading of the record makes it quite clear that Jennifer was spirited off to see psychologists by her father and instructed rather specifically on the way by her father and older brother regarding what to say. She related to her mother after-the-fact that she told lies and even Dr. Yeargan discerned that she had been coached.

Justin and Jennifer should have been placed in the custody of their mother. The majority wreaks further havoc on this family (especially Jennifer) by a remand for further evidence. It appears that anxiety and manipulation will again be the order of the day for this little girl, and life's most basic uncertainties will resume as the family is figuratively killed with due process.

This case as written will have little impact on anyone's lives other than the parties themselves. But what it should have is a

very clear, bright line syllabus point that domestic violence is a very important consideration in determining child custody. So long as this Court sends a different signal to family law masters, magistrates and circuit judges, the response of the judicial system to family violence will continue to be inadequate.

The judicial system in this country is the last·bastion of almost total male domination. Judges bring to their work all their social, cultural, personal values and experiences.

In 1971, two white male law professors studied the response of American judges to sex discrimination cases up to that time and wrote:

> Our conclusion, independently reached, but completely shared, is that by and large the performance of American judges in the area of sex discrimination can be succinctly described as ranging from poor to abominable. With some notable exceptions, they have failed to bring to sex discrimination cases those judicial virtues of detachment, reflection and critical analysis which have served them so well with respect to other sensitive social issues.... Judges have largely freed themselves from patterns of thought that can be stigmatized as "racist" ... [but] "sexism"—the making of unjustified (or at least unsupported) assumptions about individual capabilities, interests, goals and social roles solely on the basis of sex differences—is as easily discernible in contemporary judicial opinions as racism ever was.

L. Crites, *A Judicial Guide to Understanding Wife Abuse*, The Judges' Journal, 5, 7 (Summer 1985).

In 1977, Beverly Cook of the University of Wisconsin in Milwaukee analyzed the United States Supreme Court cases affecting woman from 1971 to 1977, and concluded that members of the Court were more influenced by their personal values than by legal principles. *See* Crites, *supra,* at 7.

Obviously, gender bias continues to exist in the court system in many contexts, pointing up not only the need for judicial education on gender-related issues, but also for larger numbers of women in the judiciary.

Since the majority has directed that this case be remanded on the best interests of Jennifer, the family law master and circuit court should permit evidence on family violence and should appoint an expert who knows something about this issue, for both evaluation and counselling. Carlotta Smith, the director of the *Women's Resource Center* in Beckley, West Virginia, who is a master's level counsellor and works daily with families whose lives have been disrupted by abusive relationships or someone with similar expertise should be considered.

Lastly, this Supreme Court in its administrative capacity should not only continue to develop training for judges, family law masters and magistrates on domestic violence, but should also get in touch with the fact that the members of this Court need such training as well.