520 S.E.2d 197

### KEVIN S.E., Sr., Plaintiff Below, Appellee,

v.

### DIANA M.E., Defendant Below, Appellant.

### No. 26007.

Supreme Court of Appeals of West Virginia.

Submitted June 8, 1999.

Decided July 12, 1999.

Dissenting Opinion of Chief Justice Starcher Sept. 8, 1999.

---

Kevin S.E., Sr., Pro Se.

Jane Moran, Esquire, Williamson, West Virginia, Guardian ad Litem.

Catherine Bond Wallace, Esquire, Appalachian Research and Defense Fund, Inc., Princeton, West Virginia, Attorney for Appellant.

PER CURIAM:

This is an appeal by Diana M.E. from a divorce order of the Circuit Court of McDowell County awarding her former husband, Kevin S.E., Sr., custody of the parties' two infant children. In making the custody award, the circuit court rejected the recom-

mendations of the family law master in the case. On appeal, the appellant claims that the circuit court erred in not adopting the family law master's recommendation and in overruling the family law master's findings.

## I.

### Facts

The appellant, who is a native of Mexico, and who has only a limited command of the English language, married Kevin S.E., Sr., in El Paso, Texas, on February 20, 1989. Two children were subsequently born of the marriage on December 28, 1989, and January 15, 1992. During their marriage, the parties lived in various places, and Kevin S.E., Sr., worked at a number of jobs, some of which took him away from home for long periods of time. During those periods, the appellant was the primary caretaker of the parties' two infant children.

On April 28, 1997, Kevin S.E., Sr. filed a complaint for divorce in the Circuit Court of McDowell County. In the complaint, Kevin S.E., Sr. alleged that irreconcilable differences had arisen between the parties and that he had been subjected to cruel and inhuman treatment.. He also alleged that the parties had been separated for more than one year.

The appellant responded to the complaint by letter dated May 22, 1997, in which she stated that she lived in Texas, that she had hospital bills, and that she needed extra time to prepare and to obtain the services of an attorney. At the time this letter was submitted, another letter prepared by Dr. Guillermo E. Palomo, the appellants' physician, was filed with the court. Dr. Palomo's letter stated that the appellant was separated, was a Hispanic lady and that she was suffering from a major depressive disorder with psychotic manifestations. The letter also stated that the appellant tended to decompensate easily and become psychotic, but that she is handling herself rather well while taking several medications.[1]

After receiving the appellant's letter, the court allowed her to obtain an attorney, and an answer was subsequently filed.

A temporary hearing was conducted in the case on December 2, 1997, at which hearing the appellant was found to be the primary caretaker of the children prior to the parties' separation and was awarded temporary custody of the children. At the hearing, Kevin S.E., Sr. testified that the appellant suffered from, and had been hospitalized many times for, mental illness. He also testified that the appellant saw and heard things "that were not there" and that she slept a lot. The appellant denied hallucinations or other unusual behavior. A report from the appellant's treating psychiatrist indicated that she would decompensate when she moved to West Virginia. The appellant's psychiatrist did not believe that she was suffering from paranoia, and he stated that she was, in fact, "now free of symptoms of depression and psychosis."

Additional hearings were conducted in the case commencing on March 30, 1998. During those hearings, Kevin S.E., Sr. introduced evidence showing that the appellant had cut one of the children's panties and shirt, had fed the children baby food, had made one of the children wear diapers, had fed the children junk food and had made one child wear a sanitary pad. There was also evidence that the appellant did have mental problems, although portions of the evidence suggested that the problems were exacerbated by the stress involved in the parties' relationship.

On March 30, 1998, the family law master ordered that a home study be conducted on the appellant's home and another home where she proposed to live after the parties' divorce. The home studies were filed with the court on or about June 2, 1998, and on July 10, 1998, the family law master submitted a recommended decision to the circuit judge. The family law master recommended that the appellant be awarded custody of the parties' infant children. In addressing the

---

1. Who sent the letter to the court is unclear. It was received the same day as the appellant's letter. The letter contained the statement: "This letter is written on her behalf in order for her to use it in the effort to have custody of the children or have the privilege of seeing the children."

question of the appellant's alleged mental problems, the family law master found:

> With regards to plaintiff's contentions regarding Diana's mental stability, it is found that Diana did suffer mentally and emotionally from October 1995 through June 1996 due at least in part, if not wholly, by her union with the plaintiff and what defendant perceived as criminal activity of the plaintiff. It is also found that since separation of the parties, plaintiff has been free of any symptoms or manifestations of any mental illness, as indicated by her treating physician's report and telephone interview, her testimony, her children's testimony, the home studies, testimony of the SAFE Workers where she resided for an extended length of time, although she has had difficulty communicating because of the language barrier.

After receiving the family law master's recommendations, the circuit judge reviewed them in light of the evidence in the case and on September 1, 1998, entered the order from which the present appeal is taken. In that order, he rejected the recommendation that the appellant receive custody of the parties' children and awarded custody to Kevin S.E., Sr. In making this decision, the trial court specifically overruled the family law master's finding on the appellant's mental condition. The court stated: "[F]rom all the evidence on record, the Law Master should have found that defendant suffers from 'mental illness' rather than a problem with 'mental stability' which illness, with proper ongoing treatment, can be controlled with proper permanent treatment" and that "the Law Master should have found that defendant does in fact suffer from permanent incurable mental illness." The court further ruled that as a consequence of her mental illness, as well as her illiteracy and lack of skills, the appellant was not a proper person to have custody of the parties' children.

In the present proceeding, the appellant claims that the circuit court erred in not adopting the family law master's recommendation, despite the fact that there was substantial evidence to support the family law master's findings and that recommendation.

## II.

### *Standards of Review*

This Court has indicated that it will review a circuit court's factual findings under a clearly erroneous standard, while questions of law are subject to *de novo* review. *Burnside v. Burnside*, 194 W.Va. 263, 460 S.E.2d 264 (1995).

■ On the other hand, since the Legislature amended W. Va.Code 48A-4-20(c), effective 90 days after April 12, 1997, it is clear that a circuit court may reject a family law master's findings of fact if they are simply erroneous, and the court is not required to find them clearly erroneous to reject them.[2]

## III.

### *Discussion*

■ The principal legal argument made by the appellant in the present proceeding is that the trial judge did not follow the requirements of W. Va.Code 48A-4-20(c) in overruling the recommendations of the family law master. W. Va.Code 48A-4-20(c) provides, in relevant part:

> The circuit court shall not follow the recommendation, findings and conclusions of a master found to be:
>
> (1) Arbitrary, capricious, an abuse of discretion or otherwise not in conformance with the law;
>
> (2) Contrary to constitutional right, power, privilege or immunity;
>
> (3) In excess of statutory jurisdiction, authority or limitations or short of statutory right;
>
> (4) Without observance of procedure required by law;
>
> Nothing in this subsection shall be construed to authorize a de novo review of the facts [by a circuit judge of a family law master's findings]; however, the circuit court shall not be held to a clearly erroneous standard in reviewing findings of fact.

**2.** The circuit court rejected the family law master's findings on September 1, 1998, clearly after the amendments to W. Va.Code 48A-4-20(c) went into effect. The amended language provided, in relevant part:

(5) Unsupported by substantial evidence; or

(6) Unwarranted by the facts.

██ In a number of cases, this Court has held that this Code provision, which was previously designated W. Va.Code 48A–4–10(c) (1990), limits a circuit judge's ability to overturn a family law master's findings and conclusions unless they fall within one of the six enumerated statutory criteria contained in this section and in Syllabus Point 1 of *Higginbotham v. Higginbotham*, 189 W.Va. 519, 432 S.E.2d 789 (1993), the Court specifically stated:

W.Va.Code, 48A–4–10(c) (1990), limits a circuit judge's ability to overturn a family law master's findings and conclusions unless they fall within one of the six enumerated statutory criteria contained in this section. Moreover, Rule 52(a) of the West Virginia Rules of Civil Procedure requires a circuit court which changes a family law master's recommendation to make known its factual findings and conclusions of law.

In examining the circuit court's ruling in the present case, this Court believes that the circuit court did comply with the requirement of W. Va.Code 48A–4–20 in overruling the findings and recommendation of the family law master, and that as a consequence, the appellant's assignment of error and argument with regard to this point are without merit. As has previously been indicated, the trial court specifically did find from all of the evidence on the record the law master should have found that the appellant suffered from mental illness rather than a problem with mental stability and that the appellant did in fact suffer from a permanent incurable mental illness. The circuit court, in effect, found that the findings of the family law master were "unsupported by substantial evidence" or were "unwarranted by the facts" of the case, are two of the factors, which, under W. Va.Code 48A–4–20(c), and *Higginbotham v. Higginbotham, id.*, may form a proper legal basis for a circuit court's rejecting a family law master's findings.

██ Further, in examining the documents filed, this Court believes that the trial court's findings with regard to the appellant's mental condition are warranted. The appellant's own treating physician, a psychiatrist, Dr. Guillermo E. Palomo, on September 5, 1997, reported that the appellant was suffering from a major depressive disorder with psychosis, but that the disorder was in remission. Progress notes prepared by Dr. Palomo, which were later introduced into the record, shed additional light upon the nature and severity of the appellant's problems. At one point, the progress notes indicate that the appellant was experiencing hallucinations of an auditory nature which were commanding and telling her to kill herself, and that she in fact had attempted to do so while she was hospitalized. At another point, on February 7, 1996, it was reported:

While she was here, she felt so bad because she had left the children behind and she continued to have a lot of depression and paranoid ideas that she decided to kill herself as she felt that was the only solution to her problems. She was constantly thinking about how to hurt herself. She took an overdose of pills, consisting of Lithium and also of Risperdal that she had on hand. She was taken to the McAllen Medical where she was hospitalized for a few days and from there transferred to the Rio Grande State Center.....

In a diagnosis prepared at the Huntington State Hospital on a later occasion, it was reported:

According to commitment papers, [prior to her commitment] she was trying to kill herself by cutting on her wrist, and she was also described as paranoid and depressed. She became aggressive. She has a long history of hearing voices. She has taken an overdose of Haldol medication. She has a long history of mental illness and was treated in various state hospitals in the past.... She reportedly hears voices which tell her to kill herself.... She has a history of trying to drink Clorox. Once she put a knife on her wrist and once she tried to cut herself with a hairpin on her wrist, causing small abrasions. She once turned the gas on. She wanted her husband, her children, and herself to die. She reportedly lay down on her husband's father's grave and wanted to

change places with him. She reportedly attacked a man in the Princeton Emergency Room. Last June she took an overdose of six Haldol pills. She also tried to strangle her children. In the past she was diagnosed as schizophrenia paranoid. She was treated with Haldol, Risperdal, Cogentin and Xanax. At this time, following a commitment hearing, she is now being admitted to Huntington Hospital as she is considered to be dangerous to herself and also to others.

Further, while she was in Huntington Hospital, it was reported:

> The patient looks anxious and nervous.... She believes that somebody where she was in the hospital just put something in her body that makes her crazy. She seems to be suspicious and paranoid. She refused to talk about the hallucinations.... The patient has no insight with poor judgment. Later on, in the ward she tried to kill herself by putting a plastic garbage bag around her neck and the patient was placed on high suicide risk.

At still another point, a Dr. Galvez reported that:

> Ms. E.... has a long history of psychiatric problems dating back to her early 20's. She has had multiple hospitalizations both in West Virginia and Texas. She has had multiple suicide attempts and once attempted to kill her children by strangling them. She maintains a historical diagnosis of Paranoid Schizophrenia. Admission papers state that Mrs. E.... was admitted to this facility because she attempted to slash her wrists. She also reported hearing voices telling her to kill herself. When asked the reasons for her admission, she stated: "I am depressed and stressed ." There is a family history of mental illness in Mrs. E...'s mother.

This evidence, the Court believes, shows that the appellant has made repeated suicide attempts and that she had longstanding mental problems of a severe nature. Although in argument before this Court it was suggested that the suicide attempts were made to attract attention, a plausible reading of the record suggests that they were, in fact, considerably more severe. It appears that she actually took an overdose of pills and drank Clorox, activities which, if repeated, even for the purpose of attracting attention, could endanger her life and affect her care of her children. She also apparently threatened her children and engaged in activities such as turning on gas which directly threatened them. In light of this and the overall evidence, this Court believes that there was a sufficient factual basis for the trial court reasonably to conclude that the appellant suffered from a mental illness rather than a problem with mental stability and that it was a point of considerable concern in determining the appellant's fitness to have custody of the parties' children.[3]

■ This Court has repeatedly recognized that the paramount and controlling factor in awarding custody of a child is the welfare of the child and that parental rights in child custody matters are subordinate to the interest of the child. *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996); and *David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989).

There were representations during the arguments in this case that the appellant is residing in a supervised facility, and there is further evidence that the appellant's condition is currently under control with medication and that she can manage visitation with her children. This suggests that visitation should be allowed, subject to such limitations as in the judgment of the circuit court will reasonably protect the welfare of the children. It does appear from the evidence that the appellant's relationship with her former husband, Kevin S.E., Sr., has on occasion exacerbated her mental problems. Such exacerbation in the future obviously could affect her relationship with her children. In

---

**3.** It was also argued that stresses arising from the parties' marriage and from the appellant's relationship with Kevin S.E., Sr. triggered or contributed to the triggering of outbreaks of the appellant's psychological problems, and that the problems were in no way attributable to fault on the part of the appellant. However, the fact that the problems exist pervades the record in this case.

line with this, the Court believes any attempt by Kevin S.E., Sr., to alienate the children from the appellant would constitute an act contrary to the welfare of the children.

In summary, in the present case, where there was evidence that the appellant's mental problems are serious, that they involved suicidal ideation and the threat to kill her children, this Court cannot conclude that the trial court improperly overruled the finding of the family law master which suggested that the appellant's condition was not so significant as to impact upon the custody decision. Further, the Court cannot conclude that the trial court erred in awarding custody of the children to the appellant's former husband Kevin S.E., Sr.

The judgment of the Circuit Court of McDowell County is, therefore, affirmed.

Affirmed.

WORKMAN, Justice, concurring.

While I agree with the result reached by the majority, I write separately to underscore the need for the lower court to give close attention to certain issues on remand. First, I must point out that this is a very close case as far as which parent should be the custodian of the minor children of the parties. This is clear from the fact that the family law master, after hearing twelve hours of testimony, made a determination that Appellant should be awarded custody of the children.

There is no question that Appellant cares for and is deeply interested in maintaining a close relationship with her children. Proof of her interest was borne out from the fact that she traveled all night long from Texas on the eve of the hearing before this Court, according to the guardian ad litem. Despite the mental illness suffered by Appellant, which apparently is in control and was much exacerbated by her marital problems as well as her relocation to a completely foreign area,[1] she appears capable of providing love and good care to her children. The "very positive Home Study"[2] conducted by the DHHR in 1998 when the children were residing with Appellant in West Virginia evidences the fact that Appellant is capable of caring for her children. Thus, I only reluctantly join the majority in upholding their affirmance of the circuit court's reversal of the family law master.

It is thus extremely distressing that Appellee, according to the guardian ad litem, may have undertaken efforts to alienate the children from their mother. The guardian ad litem stated in her report:

> It is clear the children Diana and Kevin, Jr. are being alienated from their mother... Unless there is meaningful contact between the children and their mother soon, the alienation will likely be complete.
>
> . . . .
>
> [Appellee] appears to be unable to recognize the dangers of manipulation of the children to further his own ends. It is apparent to the Guardian this has occurred.
>
> . . . .
>
> In conclusion, the Guardian strongly recommends that whatever action the Court deems appropriate, it must be soon and it must give clear direction to the parties. Failing either, the relationship between these children and their mother will be irreparably damaged.

Given these serious concerns raised by the Guardian ad litem, it is imperative that the lower court must provide for close supervision of this case to assure that the children continue to have a right to a full relationship with their mother as well as their father. Of course, Appellant will have her seven-week period of summer visitation with her children in McDowell County where she now resides. Any evidence that surfaces concerning additional efforts on Appellee's part with regard to parental alienation should be swiftly addressed by the lower court in a firm fashion

---

1. The guardian ad litem observes in her report that, except for Appellee's father, who "unfortunately died during the year before the ... [parties'] separation, Appellee's relatives were openly hostile and very unreceptive of Appellant. This hostility had to play a significant part in her unhappiness and possibly served as a trigger to her depressed mental state."

2. This observation is made in the guardian ad litem's report.

that leaves no question that such alienation will not be countenanced. Because the guardian ad litem saw convincing evidence that Appellee had already begun to be successful in his attempts at parental alienation, it would be advisable for the lower court to direct the guardian ad litem to continue to oversee this matter in the interest of encouraging and permitting the children to have a full, healthy, loving relationship with both parents.

Lastly, I commend the guardian ad litem, Jane Moran, for her responsiveness to this Court's appointment of her and for the insightfulness and compassion she has demonstrated in seeking to protect the interests of these children.

STARCHER, Chief Justice, dissenting.

(Filed Sept. 8, 1999)

In the instant case, the circuit court erred in overruling the family law master.

The appellant's fitness to have custody of her children as found by the family law master was supported by her treating physician's report, her testimony, her children's testimony, "very positive" home studies, and testimony of social workers. Under our primary caretaker standard, if she is fit, she gets custody.

The appellant is a dark-complected woman from Mexico. It is unsurprising but tragic that she was not well-received by her "white" former husband's family in McDowell County, and this exacerbated her emotional distress. It is equally unsurprising but tragic that her former husband tried to encourage his children to fear and hate their mother.

It is indisputable that had these children been able to remain with their mother in Texas, they would in all likelihood have been safe and well cared for. But "home cooking" tilted the balance against her, despite the careful consideration that the family law master gave the case. In my opinion, this case shows that the stereotypes of race and the stigma of mental illness are still weaknesses in our court system.

Accordingly, I dissent.